2012 COA 132

The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Thomas Anthony GARRISON,
II, Defendant–Appellant.

No. 08CA2637.

Colorado Court of Appeals,
Div. VII.

Aug. 16, 2012.

As Modified Sept. 27, 2012.

John W. Suthers, Attorney General, Ryan A. Crane, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Joan E. Mounteer, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge MILLER.

¶ 1 Defendant, Thomas Anthony Garrison, II, appeals the judgments of conviction entered against him after a jury found him guilty of first degree murder after deliberation, first degree felony murder, conspiracy to commit first degree murder with a crime of violence sentence enhancer, two counts of aggravated robbery, and conspiracy to commit aggravated robbery. Defendant contends that the trial court erred in (1) asking witnesses hundreds of questions submitted by jurors; (2) denying defendant's motion to strike a juror who submitted a substantial portion of those questions for failing to pay

attention; (3) denying defendant's motion for a new trial after learning that during deliberations the jury accessed text messages on a cell phone admitted into evidence; and (4) denying a challenge for cause to a potential juror. We are not persuaded by defendant's arguments. We therefore affirm.

## I. Background

¶ 2 Defendant and his uncle were both drug dealers and engaged in selling cocaine and marijuana. The victim supplied them with cocaine. Defendant's uncle owed the victim $10,000, and the victim was "pressing him" to be paid. The uncle planned to kill the victim and take his place in the cocaine-dealing hierarchy, making defendant his "right hand man." He wanted defendant to come along to kill the victim in order to "get his feet wet, pop his cherry."

¶ 3 The night before the victim was killed, defendant and another drug dealer, R.G., stole a car to use as a get-away. R.G. drove defendant and his uncle to the victim's apartment the next day. He waited in the car while defendant and his uncle entered the victim's apartment. Defendant's uncle shot the victim, and a bullet from the uncle's gun passed through the victim into defendant's leg. Defendant then emptied his gun into the victim.

¶ 4 Defendant fled the state with his uncle, R.G., and defendant's girlfriend. Defendant and his girlfriend were later found in Arizona.

¶ 5 Defendant's theory of defense was that his uncle killed the victim and that defendant did not know he was planning to do so. R.G. testified against him at trial, and defendant attacked his credibility.

## II. Questions from the Jury

¶ 6 We reject defendant's argument that the trial court erred in allowing jurors to submit hundreds [1] of questions for witnesses over the course of the two-week trial.

### A. Standard of Review

¶ 7 We review the trial court's decision not to prohibit or limit the number of juror questions tendered for an abuse of discretion. *See* Crim. P. 24(g) (granting the trial court discretion to prohibit or limit juror questioning in particular cases based on several factors); *see also Medina v. People*, 114 P.3d 845, 847 (Colo.2005) (leaving the decision whether to ask a particular question tendered by a juror for a witness to the sound discretion of the trial court). We will conclude that the trial court abused its discretion only if the trial court's ruling was manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993); *People v. Clark*, 214 P.3d 531, 539 (Colo.App. 2009). Because defendant preserved the issue the in trial court, we review for harmless error. *Medina*, 114 P.3d at 858. An error is harmless if it did not substantially influence the verdict or impair the fairness of the trial. *Id.*

### B. Analysis

¶ 8 Crim. P. 24(g) allows jurors to submit written questions to the court for the court to ask of witnesses, but gives trial court discretion to prohibit or limit questioning "for reasons related to the severity of the charges, the presence of significant suppressed evidence or for other good cause." Crim. P. 24(g). In *Medina*, the supreme court held that questions from jurors do not constitute a per se violation of a criminal defendant's constitutional rights. 114 P.3d at 847. The court pointed out that juror questions had "'deeply entrenched' roots in the common law." *Id.* (quoting *United States v. Bush*, 47 F.3d 511, 515 (2d Cir.1995)). It noted that "[c]ommentators ... agree that juror questioning facilitates the search for truth and justice, clarifies the facts in complex cases, provides the jury with an essential tool to fulfill its role as the finder of fact, and increases juror attentiveness during trial and satisfaction with the judicial process." *Id.*

---

1. Defendant's Opening Brief represents at one point that the jurors "submitted" over 450 questions and at another point that the court "permitted jurors to ask over 450 questions." We have not attempted a precise count of the number of questions submitted by the jurors or the number of those questions actually asked of witnesses, but it is clear from the record that the number in both categories mounts into the hundreds.

The court also concluded that the act of asking a question does not necessarily transform an otherwise passive juror into an advocate, or reduce the government's burden in a criminal case. *Id.* at 854, 856.

¶ 9 Defendant presents three arguments in support of his claim that the trial court exceeded what the supreme court authorized in *Medina* by allowing the jurors to ask hundreds of questions: (1) the trial court wasted a great deal of time in reviewing the questions, (2) the jurors became investigators and advocates over the course of the trial due to the volume of questions asked, and (3) the burden of proof improperly shifted from the prosecution to him.

¶ 10 After reviewing the record, we conclude that the number of questions at issue here did not violate defendant's constitutional rights. Aside from his argument that the trial court wasted time considering the questions, defendant raises arguments that the supreme court already addressed in *Medina*.

### 1. Judicial Economy

¶ 11 Defendant argues that the trial court's failure to prohibit or limit questions resulted in the court spending an inordinate amount of time conducting hearings regarding whether or not to ask the questions of the witnesses. He points out as examples that the hearings on questions submitted span approximately thirty pages of the record for the prosecution's key witness, fifteen pages each for defendant's brother and a detective, and approximately sixty pages for defendant's testimony.

¶ 12 In holding that juror questions are not per se unconstitutional, the supreme court in *Medina* reasoned in part that a defendant's constitutional rights are protected when jury questions are scrutinized under "adequate safeguards," which include the trial judge screening the juror questions with counsel before submitting them to a witness. *Id.* at 847, 857. Here, the trial court gave careful consideration to each submitted juror question before asking it of a witness, sustained objections to a substantial portion of them, modified some questions to comply with the rules of evidence, and generally exercised caution in securing defendant's constitutional

safeguards anticipated by *Medina*. Defendant did not object to many of the questions on grounds other than his general objections to juror questioning.

¶ 13 We conclude that the trial court did not abuse its discretion by declining to prohibit or limit the number of juror questions. Crim. P. 24(g) provides that jurors "shall" be allowed to ask questions. The word "shall" indicates an obligation, and thus the rule strongly favors allowing juror questions. *See Kidder v. Chaffee County Bd. of Equalization,* —— P.3d ——, ——, 2011 WL 5437499, *2 (Colo.App. Nov.10, 2011) (the word "shall" connotes a mandatory obligation when construing a statute); *see also People v. Fuqua,* 764 P.2d 56, 58–59 (Colo.1988) (the rules of statutory construction apply to interpreting the rules of criminal procedure). While the trial court has discretion to prohibit or limit juror questions based on "the severity of the charges, the presence of significant suppressed evidence or for other good cause," it was not manifestly arbitrary, unreasonable, or unfair for the trial court to decline to prohibit or limit the submission of juror questions in the pursuit of judicial economy here. *See* Crim. P. 24(g).

¶ 14 The unusual number of questions submitted must be viewed in the context of a ten-day murder trial involving six separate charges and more than thirty witnesses and 170 exhibits. The length and complexity of the trial were factors that the trial court properly could have considered in deciding whether to prohibit or limit jury questions. *See Medina,* 114 P.3d at 852 (noting that commentators agree that juror questions clarify the facts for the jury in complex cases); *see also United States v. Collins,* 226 F.3d 457, 463 (6th Cir.2000) ("Even cases that could not be described as complex may occasionally warrant questions by jurors, although we think that the balance of risks to benefits is more likely to weigh in favor of juror questions in complex cases."). Based on these circumstances, we conclude that the trial court did not abuse its discretion in declining to prohibit or limit the number of juror questions.

¶ 15 In any event, defendant does not assert any specific prejudice resulting from the additional time required for reviewing the questions. *See DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 517 (4th Cir.1985) (rejecting the appellant's claim that the sheer volume of the ninety-five questions from the jurors demonstrated "a loss of control by the court, thereby prejudicing the appellant's rights," in part because the appellate court could not discern prejudice to any party).

¶ 16 Defendant also cites CRE 403, which allows courts to exclude relevant evidence to avoid "undue delay, waste of time, or needless presentation of cumulative evidence." Courts are given broad discretion in performing the CRE 403 balancing test, and a trial court's balancing decision will not be disturbed absent an abuse of discretion. *People v. Gibbens*, 905 P.2d 604, 607 (Colo. 1995). Here, however, defendant does not argue that the trial court failed to *exclude* any particular evidence because it was cumulative or wasted time. CRE 403 is therefore inapposite.

### 2. Jurors as Investigators and Advocates

¶ 17 Defendant claims that, based on the number and content of the questions asked, the jurors ceased to be objective fact finders and became investigators and advocates. He argues that the juror questions reveal that the jury formed premature conclusions and biases about the case. Defendant cites the following examples, among others:

- Questions asking why defendant fled from Colorado after the victim's death; for example, one juror asked defendant, "Why would you leave the state if you did not kill [the victim]?";

- Questions about why defendant did not seek medical treatment for a gunshot wound he received contemporaneously with the victim's death;

- Questions about why defendant did not go to the police after the shooting;

- Questions seeking out the specifics of defendant's drug-dealing relationship with the victim;

- One question that a juror submitted, but was screened out by the trial court, asking: "You said you 'didn't do anything wrong,' but you did help steal the Honda? Do you consider that wrong?"

¶ 18 The defendant has a right to an unbiased jury; however, this does not mean that a jury must "sit[ ] as a passive receptacle of information." *Medina*, 114 P.3d at 856–57. A juror may form a bias about a piece of evidence or make a determination about the credibility of a witness over the course of a trial without necessarily violating a defendant's rights. *Id.* at 857.

¶ 19 The questions defendant takes issue with appear to represent attempts to understand, clarify, or expand upon defendant's testimony. They do not demonstrate that members of the jury prematurely formed conclusions or biases or departed from their role as fact finders. Accordingly, the questions asked were permissible. *See id.* at 853 (reviewing studies which "contradict[ ] the general assertion that jurors become advocates rather than remain neutral" when asking questions and that "juror questions [do] not have a prejudicial effect on the trial").

### 3. Alleged Burden Shifting

¶ 20 Defendant also contends that the pre-deliberation conclusions formed by the jurors impermissibly shifted the burden of proof from the state to him. As explained above, however, the record does not show that the jury improperly formed conclusions before the close of the evidence. Further, the fact that questions from the jurors elicited information that was relevant and potentially harmful to defendant's theory of the case did not diminish the state's burden of proof. *See id.* at 856 ("Due process also requires that the prosecution prove every element of a charged offense beyond reasonable doubt. . . . This does not mean that the government's burden is lessened simply because a juror asks a question which solicits additional relevant information in a criminal case.").

¶ 21 We therefore conclude that the trial court did not abuse its discretion by declining

to prohibit or limit questions submitted by the jurors.

### III. Motion to Strike Juror V.

¶ 22 We also reject defendant's claim that one juror should have been removed because she did not pay attention.

¶ 23 The juror at issue, Juror V., submitted significantly more questions for witnesses than the other jurors. Specifically, defendant represents that of the seventy-two juror question forms submitted for defendant's testimony, Juror V. submitted thirty-seven.[2] She submitted many more questions throughout the trial, and her questions very often had many sub-parts. Additionally, defendant points out that some of the questions submitted by Juror V. related to issues that he had already discussed in his testimony. Defendant moved to "strike" Juror V. from the jury on two occasions and the trial court denied defendant's motions.

¶ 24 Defendant argues that Juror V. could not have been paying attention at trial because she spent so much time writing questions. He claims that many of Juror V.'s questions were already answered during witness testimony and points out that the trial court expressed surprise that Juror V. could write so many questions.

### A. Standard of Review

¶ 25 If jury misconduct substantially affected the rights of a defendant to a fair and impartial trial, the defendant may be entitled to a new trial. *People v. Evans,* 710 P.2d 1167, 1168 (Colo.App.1985). We review a trial court's ruling whether juror actions constituting misconduct occurred for an abuse of discretion. *See People v. King,* 121 P.3d 234, 241 (Colo.App.2005) (reviewing a trial court's factual determination that a juror was not sleeping during trial for abuse of discretion); *People v. Hayes,* 923 P.2d 221, 228 (Colo.App.1995) (same).

¶ 26 The People argue that, because defendant did not mention the Constitution or his

right to a jury trial to the trial court, we should reverse only if the error was plain. *See People v. Miller,* 113 P.3d 743, 749–50 (Colo.2005) (absent a contemporaneous objection, constitutional errors are reviewed for plain error only). Because we conclude that the trial court did not abuse its discretion, we need not reach that issue.

### B. Analysis

¶ 27 Defendant argues that the facts of this case are similar to those of *Evans.* In *Evans,* a juror slept during defense counsel's closing argument. 710 P.2d at 1167–68. The trial court denied defendant's motion for judgment of acquittal, or alternatively for a new trial. *Id.* Significantly, the trial court expressly found that the juror was asleep during an important part of the trial and therefore held the juror in contempt. *Id.* A division of this court held that the defendant was prejudiced by the juror's misconduct and granted the defendant a new trial. *Id.*

¶ 28 By contrast, based on our review of the record, we conclude that several factors here demonstrate that Juror V. listened carefully and was fully engaged.

¶ 29 First, on several occasions during the trial she raised her hand and asked that a response be repeated because she could not hear or understand it. Second, Juror V.'s enthusiasm for submitting questions indicates that she was especially engaged and attentive. *See Medina,* 114 P.3d at 854 (considering studies which conclude that allowing juror questions promotes jurors becoming "more engaged in the trial" and more attentive to witnesses). During voir dire, defense counsel asked Juror V. about the manner in which law enforcement should investigate criminal activity, and Juror V. emphasized the importance of investigating facts and following leads when feasible. Consistent with that response, her questions show that she had identified many issues on which she wanted clarification and that the testimony elicited by the attorneys did not provide as complete a picture as she desired.

---

2. Defense counsel made this representation based on her own identification of handwriting, with respect to which the People did not agree, and the trial court did not adopt her representation as a finding. We nevertheless accept it for the purposes of evaluating defendant's contentions.

¶ 30 Third, the record does not establish a temporal relationship between when Juror V. wrote down a question and when the response to the prior "asked and answered" question was given. For example, on at least one occasion, defense counsel indicated that Juror V. had probably written down a question before it was answered by a witness.

¶ 31 Fourth, the trial court never instructed the jurors that they could not submit a question that had previously been asked and answered if they were not satisfied with the answer, or that they could not phrase a question in a somewhat different way from how it had been posed by one of the lawyers. In fact, when instructing the jury on juror questions, the trial court explained that "[w]e don't expect you to know or even care about [the rules of evidence]" and invited the jurors to "ask whatever questions [they wanted] to ask." As a result, Juror V. could reasonably have understood that she could submit a question in her own words, even if it had been previously asked.[3]

¶ 32 Accordingly, we cannot say that the trial court abused its discretion in declining to remove Juror V. based on inattentiveness. *Cf. Hayes*, 923 P.2d at 229 (finding no abuse of discretion in trial court's denial of a new trial for misconduct where record did not reflect that a juror actually slept during trial but trial court had admonished the juror once for "having trouble keeping her eyes open").[4]

## IV. Text Messages Viewed by the Jury

¶ 33 During trial, the prosecution admitted three cell phones into evidence through a detective who had discovered them in defendant's girlfriend's purse. Defense counsel stated that she had no objection to the admission of the cell phones. Later, a detective who had examined the phones explained that he had discovered defendant's phone number in one of the phone's address book under the name "Teflon." Defendant testified at trial and explained that his number was listed as "Teflon" in his girlfriend's phone. The girlfriend also testified that defendant's number was listed in her cell phone under the same name.

¶ 34 After the trial, the prosecution filed a "Notice" with the trial court. It explained that two of the cell phones admitted, which both the prosecution and defense believed had dead batteries, were somehow turned on by the jury, allowing the jury access to information on the phones. Specifically, the jury accessed text messages on the girlfriend's phone and photographs on one of the other phones. Defense counsel moved for a new trial, arguing that the text messages from the girlfriend's phone were extraneous information under CRE 606(b) that had prejudiced the jury. In its response, the prosecution argued that the text messages were extraneous, but not prejudicial. The trial court denied defendant's motion for a new trial. It questioned whether the text messages were extraneous, because the cell phone was admitted without objection or limitation. Even assuming that the information was extraneous, however, it determined that the text messages were not prejudicial. On appeal, defendant claims that the information on the girlfriend's cell phone was extraneous prejudicial information and that this court must remand for a new trial or for a hearing regarding jury misconduct. We are not persuaded that the information was extraneous.

### A. Standard of Review

[11] ¶ 35 Whether extraneous prejudicial information was before the jury presents a mixed question of law and fact. *Kendrick v. Pippin*, 252 P.3d 1052, 1064 (Colo.2011). We review de novo the court's conclusions of law,

---

3. Defendant has not appealed the trial court's overruling of "asked and answered" objections to any of Juror V.'s questions. The court also sustained a number of objections on that ground.

4. Defendant also references without discussion section 16–10–106, C.R.S. 2011, which allows a trial court to remove a juror if, "by reason of illness or other cause," the juror "becomes unable to continue until a verdict is reached."

However, defendant's argument centers on the right to a jury trial, and he provides no support for the argument that the juror should have been removed under the statute. We therefore decline to consider the application of section 16–10–106 to this case. *See Barnett v. Elite Properties of America, Inc.*, 252 P.3d 14, 19 (Colo.App.2010) ("We will not consider a bald legal proposition presented without argument or development.").

but review the court's findings of fact for an abuse of discretion. *Id.*

### B. Analysis

 ¶ 36 CRE 606(b) generally bars juror testimony concerning jury deliberations. However, a court will set aside a verdict under CRE 606(b)(1) because jurors were improperly exposed to extraneous prejudicial information where the defendant demonstrates (1) that extraneous information was before the jury and (2) "a reasonable possibility that the extraneous information would affect the verdict of a typical jury to the defendant's detriment." *People v. Holt*, 266 P.3d 442, 446 (Colo.App.2011) (citing *People v. Harlan*, 109 P.3d 616, 625 (Colo.2005)). For purposes of CRE 606(b)(1), extraneous information is defined as information *"not properly received into evidence* or included in the court's instructions." *Harlan*, 109 P.3d at 624 (emphasis added).

 ¶ 37 We hold that the text messages at issue do not constitute extraneous information for two reasons. First, the text messages were stored in the cell phone, which was admitted into evidence without any qualification or limitation. Second, by turning on the cell phone to discover the text messages, the jury used the cell phone as it was intended to be used and discovered information within the scope and purview of the evidence.

¶ 38 Appellate courts in other jurisdictions have held that text messages and other data discovered by jurors during deliberations are not extraneous information because the data is intrinsic to the cell phone admitted into evidence. In *Hape v. State*, 903 N.E.2d 977, 987–88 (Ind.Ct.App.2009), the Indiana Court of Appeals reasoned that text messages are "part and parcel" of a cell phone just as "pages in a book belong to the book by their very nature;" information stored in a cellular phone is intrinsic to the phone itself. *Id.; see also Drammeh v. State*, 285 Ga.App. 545, 646 S.E.2d 742, 744–45 (2007) (trial court did

not abuse its discretion by allowing the jury to consider evidence that it found on a cell phone during deliberations when the phone was admitted without objection or limitation and a witness was questioned during trial about the phone's contents).

¶ 39 We agree with the reasoning of these courts and conclude that the messages at issue here were part of the cell phone which was admitted into evidence. *Cf. People v. Taylor*, 2012 COA 91, ¶ 17, 296 P.3d 317 (upholding search of the call history of a cell phone, seized incident to an arrest, to confirm that the arrestee had called a confederate to sell drugs to an undercover agent).

¶ 40 As informational material intrinsic to the cell phone, the text messages were admitted into evidence when the cell phone was admitted without any limitation. Despite testimony concerning the contents of the girlfriend's cell phone, defense counsel said that she had no objection to the phone's admission and did not attempt to limit its use in deliberations.

¶ 41 Defendant asserts that he had no duty to examine prosecution exhibits before they were admitted and submitted to the jury. Rather, he contends that the prosecution and the court had the burden of performing that task. His position was rejected by another division of this court in *People v. Bieber*, 835 P.2d 542 (Colo.App.1992), *aff'd on other grounds*, 856 P.2d 811 (Colo.1993). There, during deliberations, the jury found a small plastic bag containing white powder in a prosecution exhibit containing several large bags of marijuana. The division held that "[t]he defendant has a responsibility to check exhibits and to object to the inclusion of evidence not admitted during trial." 835 P.2d at 547.[5]

¶ 42 In any event, nothing in the record establishes that the jury discovered the messages through any misconduct. The phones were sent into the jury room with no restrictions. The text messages also fell within the

---

**5.** Defendant argues that *Bieber* is distinguishable because, in that case, there was other evidence that "alleviated the prejudice" of the white powder in the plastic bag. That distinction, however, relates to only one of the two requirements for setting aside a verdict under CRE 606(b)(1)—

prejudice. It does not bear on whether the presence of the plastic bag in the jury room was extraneous. The division in *Bieber* did not refer to CRE 606 or discuss whether the plastic bag was extraneous.

scope and purview of the evidence presented at trial. A jury is exposed to extraneous information from an exhibit during deliberations when the exhibit is "not used according to its nature and within the scope and purview of the evidence." *People v. Thompson,* 121 P.3d 273, 277 (Colo.App.2005) (internal quotations omitted); *see also Pratt v. Rocky Mountain Natural Gas Co.,* 805 P.2d 1144, 1147 (Colo.App.1990) (holding that it was not improper for jury to look for leaks in a furnace by placing a lit flashlight inside of the furnace and turning the lights off in order to test expert testimony about leaks); *Hape,* 903 N.E.2d at 988 (jury was not exposed to extraneous information when it turned on a cell phone admitted into evidence because "[t]urning on a device that is made to be turned on constitutes a permissible examination of the evidence before the jury").

¶ 43 Here, the trial court admitted the cell phone into evidence, and testimony at trial referred to information stored on the cell phone. We cannot conclude that the jury used the cell phone in a manner inconsistent with its nature by turning it on, or that the text messages were beyond the scope and purview of the evidence. Defendant claims that the jury may have tampered with the cell phones in order to access the text messages; however, he admits that "the state of the batteries when the jury received them is unknown." Nothing in the record indicates that the jury tampered with the cell phones. This argument is purely speculative.

¶ 44 For these reasons, we conclude that the text messages at issue here did not constitute extraneous information. We therefore need not determine whether they were prejudicial.

### V. Challenge for Cause

¶ 45 The trial court denied defendant's challenge for cause to "Prospective Juror T." Early in the voir dire, this prospective juror indicated that he was "inclined" to favor defendant because of his physical presence in the courtroom, as opposed to the People, who had no physical representation. Later, however he said that his father was a deputy sheriff, his mother was appointed "special deputy for traffic and investigation" at an airport, and he had "numerous friends" who worked in law enforcement. When asked by defense counsel how his connections to law enforcement would affect him if he were selected to serve on the jury, Prospective Juror T. explained:

> I do hold law enforcement in high regards. I do believe that they do the best they can under the given circumstances, and they usually try to do their job . . . just because of the way that I was brought up . . . . So I do hold law enforcement in higher regard than most people.

The following colloquy ensued:

> [Defense Counsel]: So what I hear you saying is that, you know, I use the term 'bump in credibility,' but they're going [to] start at a higher level of credibility for you?
>
> [Prospective Juror T.]: Yes. They are because we already suspect [sic] them to hold law enforcement in a higher responsibility in the first place, because they're in the position that they are to protect and serve. So, therefore, their testimony usually hold[s] a higher accord than somebody who is not accustom[ed] to that would be [sic].
>
> [Defense Counsel]: Okay. So is it fair say, that if you have a bias in this case, [your] bias is going to be towards law enforcement?
>
> [Prospective Juror T.]: Yes, ma'am. Yes.
>
> . . . .
>
> [Defense Counsel]: So what I hear you saying is that your tendency is we have law enforcement sitting over at this table. DAs, DA investigator[s] are going to testify, Arvada police, that your bias is going to be towards that side, toward the police, correct?
>
> [Prospective Juror T]: Yes.
>
> [Defense Counsel]: Okay. And that's because that's based on your life experience, and your family, and relationships, and all of that.
>
> [Prospective Juror T]: Right. And I also have numerous friends who are also in law enforcement as well. So that's kind of the crowd I hang out with.

¶ 46 Defense counsel then challenged Prospective Juror T. for cause, arguing that Prospective Juror T. was biased in favor of law enforcement. The judge reserved ruling, giving the prosecution the opportunity to question Prospective Juror T.

¶ 47 The prosecutor asked Prospective Juror T. if he "could be fair to Mr. Garrison" in spite of his relationships to law enforcement personnel. Prospective Juror T. responded, "I believe that I could be fair to Mr. Garrison. However, what the question actually asked me is, if I hold an officer's testimony in higher regard than [that of the] average person, and yes, I do." In response, the prosecution asked if Prospective Juror T. meant that, because police officers swear an oath to uphold the law, they were more likely to follow sworn oaths, to which he responded, "Absolutely."

¶ 48 When defense counsel then renewed the challenge of Prospective Juror T. for cause, the trial court denied the challenge, explaining that it interpreted Prospective Juror T.'s voir dire responses as indicating only that "he holds law enforcement in high regard" and that "[h]e would expect them to be truthful." The court also noted that it believed Prospective Juror T. was "frankly led into some of the comments that he made," that "on balance, he says what probably a lot of people think ... they expect [a] cop to, say, tell the truth," and that the court did not understand Prospective Juror T. to be saying that he would "necessarily, always, believe a cop no matter what."

¶ 49 Defense counsel exercised a peremptory challenge on Prospective Juror T. and subsequently exhausted all other peremptory challenges. Defendant now argues that the trial court abused its discretion in denying the challenge for cause to Prospective Juror T. We disagree.

### A. Standard of Review

¶ 50 We review a trial court's denial of a challenge for cause to a prospective juror for an abuse of discretion. *Carrillo v. People,* 974 P.2d 478, 485 (Colo.1999). This is a very high standard of review, which gives deference to the trial court's ability to assess the potential juror's demeanor and body language, and the credibility of his or her responses. *Id.* at 486.

¶ 51 To determine whether the trial court abused its discretion, we examine the entire record of the prospective juror's voir dire. *People v. Montoya,* 141 P.3d 916, 919 (Colo.App.2006). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Luman,* 994 P.2d 432, 435 (Colo.App.1999). Where a defendant unsuccessfully challenges a potential juror for cause, uses a peremptory challenge to excuse the juror, and subsequently exhausts his remaining peremptory challenges, the trial court's ruling " 'affects a substantial right of the defendant and cannot be harmless error.' " *People v. Macrander,* 828 P.2d 234, 244 (Colo.1992).

### B. Analysis

¶ 52 An impartial jury is an essential part of a defendant's right to a fair trial. *People v. Sandoval,* 733 P.2d 319, 320 (Colo. 1987). For this reason, section 16–10–103(1)(j), C.R.S.2011, requires a trial court to dismiss a potential juror for

the existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state; however, no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.

¶ 53 *See also Sandoval,* 733 P.2d at 320. Similarly, Crim. P. 24(b)(1)(X) requires a court to dismiss a juror for cause if the juror has a state of mind "manifesting bias for or against the defendant, or for or against the prosecution." A potential juror should not, however, automatically be excused for expressing a concern about some particular aspect of the case or jury service, because such statements often reflect an effort by the potential juror to express "feelings and convictions about matters of importance in an emotionally charged setting."

*Sandoval,* 733 P.2d at 321. The trial court may give "considerable weight" to a potential juror's assertion that he or she can perform jury service fairly and impartially in the case. *Id.* Ultimately, the test applied to a challenge for cause is whether the juror "would render a fair and impartial verdict based on · the evidence presented at trial and the instructions given by the court." *People v. Vigil,* 718 P.2d 496, 500–01 (Colo.1986) (citing *People v. Abbott,* 690 P.2d 1263, 1267 (Colo.1984), and *People v. Wright,* 672 P.2d 518 (Colo. 1983)).

¶ 54 In *Vigil,* the supreme court held that the trial court did not abuse its discretion in denying a challenge for cause to a potential juror whose brother was a member of the Colorado Springs Police Department. *Id.* at 501. During voir dire, the juror said that his relationship to a law enforcement officer might subconsciously affect him and that he " 'might be inclined to give more weight to the testimony of the law enforcement people, based on the association.' " *Id.* At the same time, however, the juror explained "that he would be willing to follow the court's instructions on credibility, that consciously he would be able to follow the court's instructions" and that he would be fair and impartial. *Id.* The supreme court concluded that, while it could properly have dismissed the juror, the trial court did not abuse its discretion in denying the defendant's challenge for cause. *Id.*

¶ 55 Based on our examination of the record, we conclude that the trial court here did not abuse its discretion in denying the challenge for cause. Like the potential juror in *Vigil,* Potential Juror T. indicated that his relationships with law enforcement officers might bias him in favor of finding police officer testimony truthful. However, just as the potential juror in *Vigil* explained that he would be fair and impartial, Potential Juror T. confirmed that he could be fair to defendant.

¶ 56 Based on its observations during voir dire, the trial court determined that Potential Juror T. was "led into" comments that he might be biased, and that his voir dire indicated only that he held law enforcement officers in "high regard." The trial court was in a better position to weigh Potential Juror T.'s tone and demeanor than we are; we can only review a cold record of the voir dire.

¶ 57 Considering the entire record of Potential Juror T.'s voir dire, we conclude that there is evidence to support a determination that Potential Juror T. would render a fair and impartial verdict based on the evidence and the jury instructions. Potential Juror T. said that he believed he could be fair. Giving deference to the trial court's observations, we conclude that the trial court did not abuse its discretion in denying the challenge for cause. *See People v. Vecchiarelli–McLaughlin,* 984 P.2d 72, 76 (Colo.1999) (reversing court of appeals' holding based on deference to trial court's observation of prospective juror, where court of appeals held that juror should have been dismissed for cause because juror failed to make a definite statement during rehabilitation).

¶ 58 The judgment is affirmed.

Judge ROMÁN and Judge RICHMAN concur.