2015 COA 44

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Willie CLARK, Defendant–Appellant.**

**Court of Appeals No. 10CA1184**

Colorado Court of Appeals,
Div. II.

Announced April 23, 2015

198

Cynthia H. Coffman, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Samler and Whitson, P.C., Eric A. Samler, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE CASEBOLT

¶ 1 Defendant, Willie Clark, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of murder (extreme indifference), one count of murder (after deliberation), sixteen counts of attempted first degree murder, two counts of second degree assault, sixteen counts of violent crime, and one count of possession of a weapon by a previous offender. He also appeals the trial court's denial of his motion for new trial. We affirm in part, reverse in part, and remand with directions.

## I. Background

¶ 2 Fifteen gunshots rang out through the streets of downtown Denver in the early morning hours of New Year's Day 2007. Those gunshots, aimed at an oversized limousine from a white Chevrolet Tahoe, left Dar-

rent Williams, a member of the Denver Broncos football team, dead; two additional people wounded; and fourteen others uninjured but shaken.

¶ 3 The prosecution's evidence showed that the victims had celebrated New Year's Eve in the VIP section of a night club in the vicinity of the Golden Triangle area of downtown Denver. Defendant and his friend, Daniel Harris, were also in the VIP section that evening. Shortly before the clock struck midnight, someone opened a bottle of champagne and began spraying it throughout the VIP section. After being sprayed, defendant and Harris started a verbal altercation with the victims, and Harris began shouting "Eastside" and "Tre Tre Crips." Defendant and Harris were then removed from the VIP section.

¶ 4 Approximately two hours later, the club closed and the partygoers streamed into the street. There, some members of the victims' group engaged in another, largely verbal, altercation with several people, including defendant. During that altercation, someone continued to yell "Eastside" and "Tre Tre Crips." Some of the evidence presented suggested that Harris was the person doing the yelling. Eventually, the victims departed in a limousine.

¶ 5 Harris testified for the prosecution at defendant's trial after having secured immunity from prosecution in this case and several other cases. According to Harris, defendant was the driver of the Tahoe, and he followed the victims' limousine after it left the nightclub. Harris stated that he was riding in the rear passenger seat as the Tahoe overtook the victims' limousine, and he saw defendant lean across the front console and fire shots from the passenger side window into the side of the limousine. Harris testified that only one gun was used, but the evidence established that, of the shots that hit the limousine, some had been fired from a .40 caliber handgun, and others had come from a .45 caliber weapon.

¶ 6 Two security guards at the nightclub testified to their observations of a green SUV that evening. One saw an individual, perhaps matching Harris's description, get into the green SUV.

¶ 7 At trial, a person who lived at the Parkway Condominiums in the Golden Triangle area testified that he was on a deck outside his eleventh-floor apartment at around 2:15 a.m. on New Year's Day when he heard between eight and ten "pops." Shortly thereafter, he saw a green or brown SUV driving at a high rate of speed traveling on the boulevard next to his apartment complex.

¶ 8 The prosecution's theory at trial centered on the assertion that defendant was a member of the Tre Tre Crips gang and, on the evening of the incident, felt that he, his gang, or a fellow member of his gang had been disrespected by the victims. Because of his allegiance to the gang, the theory posited, defendant felt compelled to commit the shooting.

¶ 9 The prosecution presented evidence that defendant confessed his involvement in the shooting to Veronica Garcia, Vernone Edwards, Julian Vigil, and J.G. (a cellmate, while defendant was imprisoned pretrial). The prosecution also introduced a letter written by defendant appearing to acknowledge his role as the shooter.

¶ 10 Defendant posited that Harris had carried out the shooting from the green SUV. He argued that Harris had provided false information to secure a favorable plea deal from the prosecution.

¶ 11 A jury convicted defendant on all of the counts charged.

## II. Evidentiary Issues

¶ 12 Defendant contends the trial court erred in admitting or rejecting certain evidence. Specifically, defendant argues that the court: (1) erred by admitting evidence and testimony regarding his gang membership, as well as expert testimony about gang origin, structure, psychology, hierarchy, and presence in Denver; (2) erred by limiting his cross-examination of several witnesses; (3) erred by admitting Harris's prior consistent statement; and (4) erred by refusing to admit grand jury testimony of two witnesses who refused to testify at trial. We address and reject each contention in turn.

## A. Evidence of Gang Affiliation

### 1. Preservation and Standard of Review

¶ 13 The parties agree that defendant adequately preserved his arguments.

¶ 14 "A trial court has broad discretion in ruling on the admissibility of evidence." *People v. Beilke*, 232 P.3d 146, 149 (Colo.App.2009). Thus, we review a trial court's evidentiary rulings for an abuse of discretion. *Dunlap v. People*, 173 P.3d 1054, 1097 (Colo.2007). A trial court abuses its discretion when its evidentiary ruling "was manifestly arbitrary, unreasonable, or unfair." *Yusem v. People*, 210 P.3d 458, 463 (Colo.2009).

### 2. Law

¶ 15 "Evidence about gang culture is admissible if relevant to explain a circumstance of the crime, ... to show a motive for the crime itself, or to understand a witness's change in statement or reluctance to testify." *People v. James*, 117 P.3d 91, 94 (Colo.App. 2004); *see also People v. Webster*, 987 P.2d 836, 840 (Colo.App.1998) ("Evidence of the defendant's affiliation with a gang may be admitted when it is relevant to proving a motive for the crime."); *People v. Moya*, 899 P.2d 212, 218 (Colo.App.1994) ("[B]ecause [the] defendant's gang affiliation could have shown a motive to commit the crime, we conclude that such evidence was properly admitted."); *People v. Mendoza*, 876 P.2d 98, 102 (Colo.App.1994) ("Proof of intent to kill was a necessary part of the prosecution's case, and the evidence of the defendant's gang affiliation, which tended to prove the existence of a motive for killing the victim, was relevant for purposes of CRE 401.").

¶ 16 "Still, because 'gangs are regarded with considerable disfavor by our society,' gang-related evidence must be 'admitted with care.'" *People v. Trujillo*, 2014 COA 72, ¶ 72, 338 P.3d 1039 (quoting *People v. Morales*, 359 Ill.Dec. 160, 966 N.E.2d 481, 492 (Ill.App.Ct.2012)). "Hence, 'courts must be vigilant in guarding against the improper use of gang affiliation evidence as a backdoor means of introducing character evidence by associating the defendant with a gang and describing the gang's bad acts.'" *Id.* (quot-

ing *Gutierrez v. State*, 423 Md. 476, 32 A.3d 2, 13 (2011)).

¶ 17 Evidence is relevant if it has any tendency to make the existence of a fact of consequence more or less probable. CRE 401. In criminal cases, evidence is relevant if the evidence makes it more or less probable that a criminal act occurred, the defendant was the perpetrator, or the defendant acted with the necessary criminal intent. *People v. Cordova*, 293 P.3d 114, 118 (Colo. App.2011). All relevant evidence is admissible subject to certain constitutional provisions, statutes, and rules of evidence. *Id.*

¶ 18 "[R]elevant evidence can be excluded if ... its probative value is substantially outweighed by the danger of unfair prejudice." *Trujillo*, ¶ 56 (citing CRE 403). Evidence is unfairly prejudicial if it has an "'undue tendency to suggest a decision on an improper basis ... such as sympathy, hatred, contempt, retribution, or horror.'" *James*, 117 P.3d at 93–94 (quoting *Masters v. People*, 58 P.3d 979, 1001 (Colo.2002)). "In reviewing the trial court's determination, we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *Id.* at 94.

¶ 19 Relevant evidence may also be excluded under CRE 404(b) if "it is used to prove the character of a person in order to show that he or she acted in conformity with that character on a particular occasion." *Trujillo*, ¶ 56 (citing *Yusem*, 210 P.3d at 463).

¶ 20 The distinction between admissible evidence of motive and inadmissible character evidence "'is often subtle.'" *Masters*, 58 P.3d at 998 (quoting *People v. Hoffman*, 225 Mich.App. 103, 570 N.W.2d 146, 148 (1997)). In certain situations, evidence that would be otherwise labeled inadmissible character evidence "'establishes more than character or propensity'" because it "'tends to show why the defendant perpetrated a seemingly random and inexplicable attack.'" *Id.* at 999 (quoting *Hoffman*, 570 N.W.2d at 149). Subject to CRE 403, this evidence is admissible because, without it, "'the jurors may have found it difficult to believe ... that

[the] defendant committed the depraved and otherwise inexplicable actions.'" *Id.* (quoting *Hoffman*, 570 N.W.2d at 149–50).

### 3. Application

¶ 21 The trial court denied defendant's motion in limine seeking to exclude evidence of gang affiliation, finding that the case "is permeated with gang references," and that "to excise any information about gang membership or the organization of gangs

¶ 22 ... is not only impossible, but it's completely unsupportable," because the case and gang evidence involved "a huge deal about the respect issues [and] saving-face issues."

¶ 23 Defendant contends that none of the evidence regarding his affiliation with the Tre Tre Crips gang should have been admitted at trial. He argues that the shooting in this case was the result of a "bar fight" that had broken out when an individual became "upset about being sprayed with champagne." Therefore, he asserts, evidence of his affiliation with the gang was not relevant and was extremely prejudicial. We reject defendant's contention.

¶ 24 Two witnesses testified that defendant's gang affiliation had motivated him to participate in the shooting. J.G. testified that defendant had identified himself as a member of the Tre Tre Crips gang and had told him that the shooting occurred because the victims "weren't respecting Crip" and were "disrespecting the Eastsiders." Later, Julian Vigil testified defendant had told him that he had "dumped on" the victims because they were "disrespecting Denver Crips."

¶ 25 Given these facts, defendant's affiliation with the Tre Tre Crips gang "could have shown a motive to commit the crime[s]" charged requiring specific intent. *See Mendoza*, 876 P.2d at 103. Therefore, evidence of that affiliation was admissible under CRE 401 and CRE 403. *Id.*

¶ 26 Defendant also attacks the expert testimony of a police officer who testified concerning the origin of the Crips gang, its relationship with other gangs, the origin of the "sub-gang" to which defendant belonged, the hierarchy of the gang, and what it means to be "jumped in" as a member. He contends all of the expert's testimony was irrelevant, prejudicial, and constituted inadmissible evidence of bad character.

¶ 27 A division of this court recently held that the majority of a "gang expert's" testimony was inadmissible under CRE 401, 402, and 404(b). *See Trujillo*, ¶¶ 67–86. While we agree that such testimony must be "admitted with care," *id.* at ¶ 72 (internal quotation marks omitted), we nevertheless conclude that the factual circumstances present in *Trujillo* differ significantly from those presented here.

¶ 28 Importantly, the *Trujillo* division held that an expert's testimony regarding a gang's codes of respect, loyalty, and allegiance is admissible to prove a defendant's motive for committing the crime. *See id.* at ¶ 86.

¶ 29 The expert in this case testified that the Tre Tre Crips gang has a code of respect under which disrespect to one member translates to disrespect to the whole group. Thus, if one member is disrespected, the whole group must act to rectify that insult. If a member does not act, he or she stands to lose face because of cowardice. The expert also testified that loyalty and allegiance are the paramount expectations of any member of the Tre Tre Crips gang. Because this testimony explained defendant's potential motive for committing the crimes at issue, it was properly admitted. *See id.*

¶ 30 Relying on *Trujillo*, defendant asserts that the expert's testimony regarding the origin, locale, and structure of the Crips gang was irrelevant and unfairly prejudicial. Defendant also contends that the trial court erred by admitting photographs of his tattoos and allowing the expert to explain their significance. *See id.* at ¶ 77 (holding expert testimony about the organizational structure and size of the gang at issue, as well as the meaning of certain tattoos, was not probative of defendant's motive and therefore did not relate to a material fact).

¶ 31 However, "[m]aterial facts" may either be "'ultimate facts'" (i.e. evidence defendant committed the crime, evidence of the requisite intent, or evidence of deliberation)

or " 'intermediate or evidential facts, themselves probative of ultimate facts.' " *Masters,* 58 P.3d at 997 (quoting *People v. Rath,* 44 P.3d 1033, 1039–40 (Colo.2002)).

¶ 32 Here, the prosecution had to establish defendant was a member of the Crips gang in order to establish that he may have possessed the motive provided by the code of respect. Thus, many aspects of the expert's testimony were intermediate facts which, in conjunction with the lay testimony offered, were probative to show that defendant was a Crips member. *See id.* For example:

- Several witnesses testified that someone at the night club was shouting "Eastside" and J.G. testified that defendant told him the victims were "disrespecting the Eastsiders." The expert testified that the Tre Tre Crips were centered in the east side of Denver.
- A police officer testified that defendant had admitted to writing a letter in which he used the phrase "death by dishonor" when referring to "the Rican" (Daniel Harris's nickname). The expert explained that the Crip gang enforces a code of silence.
- Defendant had a tattoo that spelled the word "stacc." The expert testified that the "cc" stood for "Compton Crip" which referred to the origins of the Crips gang in California.
- Defendant had tattoos that read "MOB," "303," "Eastside" over stacks of money, and "Lett" with the "e" backwards to form a "3." The expert explained that each of these tattoos referred to common phrases used within the Tre Tre Crips gang, or the geographic area in which the gang was centered.

¶ 33 Likewise, establishing motive required the prosecution to show that the code of conduct would have been triggered by events that transpired at the nightclub. Before the expert testified, Veronica Garcia had testified that defendant was a member of the Tre Tre Crips gang, whereas Daniel Harris was a member of the Grape Street Crips gang. The parties appear to agree that Harris was the man who was sprayed with champagne at

the nightclub. Therefore, the expert's testimony regarding the structure of the subgangs that claimed allegiance to the broader Crips organization was material to establishing the relationship between defendant and Harris. *See Masters,* 58 P.3d at 997.

¶ 34 Notably, the lay witnesses and the expert in *Trujillo* had testified about several violent acts previously committed by members of the gang at issue in that case. *See* ¶¶ 34, 47, 48, 64. Neither the lay witnesses nor the expert in this case testified to any prior acts of the Tre Tre Crips gang or the broader Crips organization.

¶ 35 Unlike the evidence in *Trujillo,* the evidence in this case "was not offered to prove that the defendant was more likely to kill because he was a gang member; rather, it was offered to show that, because of his membership in a ... gang, defendant was more likely to" have the motive to commit the crimes charged against victims who had disrespected the gang. *Mendoza,* 876 P.2d at 103. Therefore, the evidence was admissible, *see id.,* because the prosecution's evidence provided a nexus between the crime and gang membership independent of any improper character evidence. And while "[w]e agree with defendant that this evidence was prejudicial," it was only prejudicial "in the sense [that] it was legitimately damaging to defendant's case." *James,* 117 P.3d at 94.

¶ 36 Therefore, the trial court did not abuse its discretion by admitting the gang evidence in question.

### B. Limits on Cross–Examination

¶ 37 Defendant asserts that the trial court abused its discretion by precluding certain lines of inquiry during his cross-examination of Daniel Harris, Vernone Edwards, and Julian Vigil. He also contends that the trial court's rulings violated his constitutional confrontation rights.

¶ 38 We conclude that the trial court did not abuse its discretion; hence, we also conclude there was no excessive limitation that violated defendant's constitutional rights.

1. Preservation and Standard of Review

¶ 39 The parties agree that defendant adequately preserved his arguments with respect to these evidentiary rulings.

¶ 40 Again, we review a trial court's evidentiary rulings for an abuse of discretion. *People v. Houser*, 2013 COA 11, ¶ 57, 337 P.3d 1238. A trial court abuses its discretion if its decision was manifestly arbitrary, unreasonable, unfair, or based on an erroneous understanding or application of the law. *Id.*

2. Cross–Examination of Daniel Harris

a. Background

¶ 41 Daniel Harris testified that defendant was the shooter. During cross-examination, defense counsel questioned Harris extensively about specific instances of his untruthfulness, which included giving a policeman a false name and pleading guilty to providing false identification to a police officer.

¶ 42 Harris also acknowledged that, in 1995, he had pleaded guilty to two felonies arising from an incident in South Dakota: aggravated assault and discharge of a firearm from a moving vehicle into an occupied structure. The trial court also permitted defense counsel to question Harris about his interactions with police during his arrest for those crimes. Defense counsel then cross-examined Harris about the timing of his arrest, his flight prior to arrest, and the false statements he had made to police about his involvement in the crime and the gun that had been used.

¶ 43 Later, defense counsel asked Harris about meeting with investigators and the deputy district attorney concerning his testimony in this case. Counsel inquired whether they had asked him about the South Dakota incident. He confirmed that they had. Defense counsel then asked whether the investigators had the "reports that said the house had holes in it." The trial court sustained an objection by the prosecutor and told defense counsel he could make an offer of proof later.

¶ 44 Outside the presence of the jury, defense counsel proffered that, when Harris had been asked about the incident in South Dakota, he claimed to have shot in the air, not at the residence. Defense counsel argued that the presence of holes in the house in combination with Harris's statements to police were probative of his truthfulness or untruthfulness.

¶ 45 The trial court stated that it had sustained the objection under CRE 403, explaining that it had considered the cross-examination in its entirety and determined that defendant had "obtained as much probative value out of that particular instan[ce] as [he was] ever ... going to." The court reasoned that the danger of unfair prejudice and confusion of the issues outweighed the probative value of any additional testimony on the topic.

b. Law

¶ 46 "Under CRE 608(b), a witness may be cross-examined about specific instances of conduct that are probative of the witness's character for truthfulness or untruthfulness." *People v. Knight*, 167 P.3d 147, 153 (Colo. App.2006). Providing false information to a police officer is probative of a witness's truthfulness under CRE 608(b). *People v. Segovia*, 196 P.3d 1126, 1131 (Colo.2008) (citing *People v. Garcia*, 17 P.3d 820 (Colo.App. 2000)).

¶ 47 Nonetheless, "[a] trial court has discretion ... to exclude CRE 608(b) evidence on CRE 403 grounds." *People v. Wilson*, 2014 COA 114, ¶ 34, 356 P.3d 956 (collecting cases). Under CRE 403, "[a] trial court should 'exclude evidence that has little bearing on credibility, places undue emphasis on collateral matters, or has the potential to confuse the jury.'" *Id.* at ¶ 36 (quoting *Knight*, 167 P.3d at 153); *see also People v. Diaz*, 644 P.2d 71, 72 (Colo.App.1981) ("[W]hen impeaching a witness the relevancy of the impeaching evidence must be clear, must not raise collateral issues, and must be directed only at the witness' credibility, and not at the witness' moral character.").

¶ 48 "A matter is considered collateral when it has no independent significance to the case and thus would not be independently provable regardless of the impeachment."

*Banek v. Thomas,* 733 P.2d 1171, 1178 n.7 (Colo.1986).

### c. Application

¶ 49 Here, the court's decision to preclude further questioning of Harris about the specific South Dakota incident in which he was allegedly dishonest was not an abuse of discretion. The trial court had properly permitted defense counsel to establish that Harris had been convicted of two felonies in South Dakota. *See* § 13–90–101, C.R.S.2014 (felony convictions of a witness are admissible). Defense counsel also had properly questioned Harris as to the name, nature, and date of those offenses. *People v. Huynh,* 98 P.3d 907, 913 (Colo.App.2004) ("[T]he scope of questioning ... is generally limited to the name, nature and date of the offense for which the witness was convicted." (internal quotation marks omitted)). Exercising its discretion, the trial court additionally allowed defense counsel to question Harris about his dishonest behavior with police when he was arrested for those crimes. *See People v. Cooper,* 950 P.2d 620, 624 (Colo.App.1997) (The scope of permissible inquiry regarding "the details of [the] prior offenses is committed to the trial court's discretion."), *rev'd on other grounds* 973 P.2d 1234 (Colo.1999).

¶ 50 Thus, defense counsel had already established that Harris had been dishonest with the police numerous times in the past. One additional instance of dishonesty arising in the context of preparation for his testimony in this case carried little probative force because the jury already had sufficient information with which to determine Harris's credibility. *See People v. Sweeney,* 78 P.3d 1133, 1137 (Colo.App.2003) ("[T]he jury heard sufficient information about [the witness] to assess his credibility" despite the trial court's ruling that precluded inquiry into two specific instances of untruthful conduct.).

¶ 51 Allowing inquiry into "details that go beyond the face of the conviction may lead to wasteful collateral disputes requiring witness testimony about the way in which the [prior] crime was committed." Roger Park & Tom Lininger, *The New Wigmore: Treatise on Evidence: Impeachment and Rehabilitation* § 3.4 (2014). As a result, a trial court must make a pragmatic decision whether the probative value of the specific details is substantially outweighed by the policy considerations of CRE 403. *See* Kenneth S. Broun et al., 1 *McCormick on Evidence* § 49 (7th ed.2013).

¶ 52 Here, the factual details underlying the South Dakota incident were collateral matters. *See Wilson,* ¶ 39. Defendant has not established that the South Dakota incident or Harris's dissembling concerning it in this case had significance independent of its impeachment value. *See id.* at ¶ 37. Indeed, the police reports from South Dakota were not independently admissible. *See People v. Inman,* 950 P.2d 640, 644 (Colo.App.1997) ("[A] specific instance of conduct ... cannot be proven by extrinsic evidence."). And defendant could not have inquired into Harris's prior conduct in South Dakota as a part of his case-in-chief. *People in Interest of K.N.,* 977 P.2d 868, 877 (Colo.1999) ("[E]vidence was collateral, and therefore inadmissible, to the extent that the [cross-examiner] could not have inquired into [the] conduct as part of [its] case in chief."); *People v. Warrick,* 284 P.3d 139, 143 (Colo.App.2011) ("By its terms, CRE 803(8)(b) excludes from the public records exception [to hearsay] any matters observed by police officers and other law enforcement personnel." (internal quotation marks omitted)).

¶ 53 Furthermore, Harris testified that he had pleaded guilty to the felonies that he had committed in South Dakota and had served a six-year sentence. Thus, the acts associated with those felony convictions were not subject to the terms of his plea agreement with federal prosecutors and did not affect his motive to testify against defendant. *See Wilson,* ¶ 37; *Huynh,* 98 P.3d at 913.

¶ 54 Under these circumstances, the trial court's decision to preclude further inquiry regarding the South Dakota incident was not arbitrary, unreasonable, or unfair. *See Cooper,* 950 P.2d at 624. Accordingly, we conclude the trial court did not abuse its discretion. *See People v. Hoover,* 165 P.3d 784, 802 (Colo.App.2006) (" 'Discretion is abused only where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety

of the action taken ... then it cannot be said that the trial court abused its discretion." (quoting *State v. Heywood*, 245 Kan. 615, 783 P.2d 890, 894 (1989); alterations omitted)).

### 3. Cross–Examination of Vernone Edwards

#### a. Background

¶ 55 Vernone Edwards· testified to a conversation in which defendant took responsibility for the shooting. He also recounted that defendant had called him after the shooting and requested that he provide defendant a replacement weapon for the one that defendant had used in the· shooting (which Edwards said defendant had disposed of). Edwards also testified to a conversation with Daniel Harris in which Harris recounted the shooting to him.

¶ 56 During his cross-examination of Edwards, defense counsel asked the witness whether he had previously engaged in a robbery that had involved three other prosecution witnesses. The prosecutor objected on CRE 404(b) grounds. During a bench conference, defense counsel stated that he was offering the testimony to show "[t]he relationship between" the four witnesses. The trial court allowed defense counsel to ask "one question" on the topic. Counsel asked the witness the question he had originally posed and Edwards responded by· saying, "Yes."

¶ 57 When defense counsel attempted to ask a follow-up question, the trial court stated that it had instructed defense counsel to ask only one question and told counsel to move on.

¶ 58 Later, defense counsel attempted to question Edwards about his statements to police officers investigating defendant's case. At a bench conference, defense counsel indicated that he was attempting to question Edwards about "another robbery" in which he had injured his foot. According to defense counsel, a police officer had asked Edwards how he had injured his foot and, after "two or three ... deceptions," Edwards admitted that he had injured himself by kicking a person in the head during a robbery. ·The trial court permitted defense counsel to ask two questions on that topic.

¶ 59 During the same bench conference, defense counsel also stated that Edwards had attempted to deceive "another person that was involved in" his drug organization. Counsel described the robbery as "an elaborate setup" designed to allow an unidentified person "that was in on the robbery ... to pretend that he wasn't."

¶ 60 The trial court reasoned that this line of questioning was "far afield ... of anything that's relevant" and that additional inquiry would confuse the jury. Pursuant to CRE 403,· the court· precluded defense counsel from asking any questions about the scheme.

#### b. Law

¶ 61 Under CRE 404(b), "relevant evidence can be excluded if it is used to prove the character of a person in order to show that he acted in conformity with that character on a particular occasion." *Yusem*, 210 P.3d at 463. However, evidence of uncharged crimes or prior acts "is admissible if used for purposes independent of an inference of bad character." *Id.* (citing CRE 404(b)).

¶ 62 In *People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990), the supreme court established a four-part test to determine the admissibility of uncharged crimes or prior acts. Relevant here, the fourth factor requires that "the probative value of the evidence [not be] substantially outweighed by the ... policy considerations of CRE 403." *People v. Sandoval–Candelaria*, 328 P.3d 193, 199 (Colo. App.2011), *rev'd on other grounds*, 2014 CO 21, 321 P.3d 487.

#### c. Application

¶ 63 Defendant contends the trial court abused its discretion by precluding his counsel's inquiry into the specific circumstances of the two robberies. We disagree.

¶ 64 There is no evidence in the record to suggest that Edwards was convicted of either of the robberies at issue. Therefore, the admissibility of evidence regarding each robbery is subject to the requirements of CRE 404(b). *See Yusem*, 210 P.3d at 463. And even if we assume, without deciding, that the evidence regarding each robbery satisfied

the first three *Spoto* factors, we conclude that the trial court did not abuse its discretion in determining that it did not satisfy the fourth factor.

¶ 65 Defense counsel offered evidence of the first robbery to establish "[t]he relationship between" the four witnesses. The court permitted counsel to inquire about it, and the witness acknowledged the relationship. Any additional evidence on the topic had marginal probative value and the trial court did not abuse its discretion in determining that any additional evidence was needlessly cumulative. *See People v. Saiz*, 32 P.3d 441, 446–47 (Colo.2001) (whether a trial court abuses its discretion depends on the offer of proof before the trial court and once the purpose for which the evidence is offered has been established, any additional evidence on the topic becomes needlessly cumulative).

¶ 66 According to defense counsel's proffer, evidence of the second robbery was offered to show Edwards's character for untruthfulness. But before addressing the second robbery, defense counsel had elicited admissions from Edwards that he had led a life of deception, had been convicted of three prior felonies, and believed criminals would deceive police officers to get out of trouble. Furthermore, the trial court permitted defense counsel to question Edwards about his untruthful statements to police regarding his role in the second robbery.

¶ 67 Because this testimony "made defendant's point clear," we conclude the trial court's ruling disallowing evidence of the elaborate robbery scheme "did not violate CRE 403." *People v. Underwood*, 53 P.3d 765, 767 (Colo.App.2002). As Edwards had already admitted past deceptions, additional inquiry regarding the elaborate robbery scheme would have, at most, provided one additional specific instance of conduct. *See People v. Rodriguez*, 209 P.3d 1151, 1161 (Colo.App.2008) (presentation of additional evidence would have had no purpose other than to inflame, distract, or confuse the jury; hence, it was excludable under CRE 403). Thus, the trial court's determination that this line of questioning would have been "largely cumulative" and stood to confuse the jury was reasonable. *Id.*

¶ 68 Accordingly, we conclude the trial court did not abuse its discretion in precluding additional questioning regarding the circumstances surrounding the robberies.

### 4. Limits on Cross–Examination of Julian Vigil

#### a. Background

¶ 69 Vigil testified that, on the morning following the shooting, defendant confessed to the shooting and inquired of Vigil how to contact a criminal defense attorney with whom Vigil was acquainted. Vigil testified that when he drove defendant to the lawyer's home, defendant explained that the victims' group had "disrespected Denver Crips," and that he was in the white Tahoe when the shooting occurred.

¶ 70 Defense counsel questioned Vigil about a prior felony conviction for theft by deception. In response, Vigil admitted that he had pleaded guilty to theft because he had purchased a vehicle using his grandmother's name without her permission.

¶ 71 Counsel then asked the witness whether he had tried to do the same thing a second time. Vigil replied by saying, "No." Counsel persisted and asked whether "[i]t was a 2002 Tahoe in March of 2005." Again, Vigil responded by saying, "No." Counsel then asked whether Vigil had taken "the finance manager to [his] grandmother's nursing home." The prosecutor objected under CRE 403 and the trial court sustained the objection.

¶ 72 Later, outside the presence of the jury, defense counsel argued that he should have been permitted to ask Vigil about the second, uncharged incident, because it was probative of his character for truthfulness or untruthfulness. The trial court ruled that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

#### b. Law

¶ 73 "[W]hile the character of a witness for truth and veracity may be shown, impeachment may not be accomplished by attacking the general character of the wit-

ness." *People v. Taylor*, 190 Colo. 210, 214, 545 P.2d 703, 706 (1976). Thus, a trial court "must ... exercise its sound discretion to preclude inquiries that ... have little effect on the witness' credibility but would substantially impugn his moral character." *Id.* at 212–13, 545 P.2d at 705. Accordingly, a trial court should not permit broad inquiry into the details of prior acts where such inquiry has little probative force, it may direct the jury's attention away from the case under consideration, and it constitutes a direct attack on the general character of the witness. *People v. Cole*, 654 P.2d 830, 834 (Colo.1982).

### c. Application

■■ ¶ 74 Defendant asserts that the trial court abused its discretion by limiting defense counsel's inquiry into the details surrounding Vigil's uncharged act. We disagree.

¶ 75 The trial court properly permitted defense counsel to question Vigil regarding the theft offense for which he was convicted. *See* § 13-90-101. Exercising its discretion, the trial court also appropriately allowed counsel to question the witness about the second, uncharged act of theft. *See* CRE 608(b); *see also Knight*, 167 P.3d at 153 (uncharged acts involving affirmative falsehoods are probative of witness's character for untruthfulness).

¶ 76 When Vigil denied that he had committed the uncharged act, counsel began to question him about the specific factual details surrounding the prior act. While the trial court gave counsel some leeway to do so, it determined that counsel's question regarding the nursing home was an impermissible attack on Vigil's general character.

¶ 77 The trial court "has ... discretion to control the extent to which" impeachment "may go." *Taylor*, 190 Colo. at 213, 545 P.2d at 706 (citing Charles McCormick, *Evidence* § 40 (2d ed.1972)). In this case, the trial court explained that the witness taking a car purchase contract to his grandmother in a nursing home, if true, was "absolutely deplorable ... and was so prejudicial ... [and its] probative value ... so minimal" that exclusion was warranted under CRE 403. Thus, the court appears to have reasonably determined that defense counsel's question regarding Vigil's visit to the nursing home was "aimed not merely at impeaching [his] credibility ... but at maligning his character and ... conduct generally." *Id.* at 214, 545 P.2d at 706. We cannot say that the trial court's assessment or the action it took was an abuse of discretion. *See id.*; *see also Cole*, 654 P.2d at 834.

### 5. Excessive Limits on Cross–Examination

¶ 78 In light of our rejection of defendant's assertion that the trial court abused its discretion in limiting the cross-examination noted above, we also conclude that the trial court's rulings did not result in a violation of defendant's constitutional rights to confront the witnesses against him.

### C. Invocation of the Fifth Amendment

¶ 79 Defendant asserts that the trial court erred in its handling of two witnesses who refused to answer questions based on the Fifth Amendment's privilege against self-incrimination. We disagree.

### 1. Law

¶ 80 "There is tension between the rights of a defendant and the rights of a witness." *People v. Smith*, 275 P.3d 715, 720 (Colo.App. 2011). On the one hand, a person has a Fifth Amendment right to refuse to give statements or answer questions that " 'might incriminate that person.' " *Id.* (quoting *People v. Blackwell*, 251 P.3d 468, 474 (Colo.App. 2010)). On the other hand, "[a] defendant's right to compel the attendance of witnesses and to offer testimony at trial is 'a fundamental element of due process of law.' " *People v. Chastain*, 733 P.2d 1206, 1212 (Colo.1987) (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

■■■■ ¶ 81 However, the defendant's right to present a defense is not absolute. *Id.* (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)). "When a defendant's rights under the Sixth Amendment collide with a witness's Fifth Amendment rights, the defendant's right to compulsory process must give way to the witness's privilege not to give

self-incriminating testimony." *People v. Coit*, 50 P.3d 936, 938 (Colo.App.2002) (collecting cases).

¶ 82 Thus, when a witness properly invokes his or her Fifth Amendment privilege, there is no violation of the defendant's right to present a defense. *Smith*, 275 P.3d at 720 (citing *United States v. Rivas–Macias*, 537 F.3d 1271, 1278 (10th Cir.2008); *Coit*, 50 P.3d at 938).

¶ 83 The privilege "is an option of refusal, not a prohibition of inquiry." *People v. Austin*, 159 Colo. 445, 450, 412 P.2d 425, 427 (1966). Thus, "the privilege ... may not be asserted in advance of the questions actually propounded." *Id.* "The proper procedure is to wait until a question which tends to be incriminating has been asked and then decline to answer." *Id.* Typically, an in camera hearing is the appropriate vehicle to conduct such an inquiry. *See People v. Fletcher*, 193 Colo. 314, 316, 566 P.2d 345, 347 (1977) (trial court did not err in holding in camera hearing to determine whether witness would testify or invoke her Fifth Amendment privilege); *People v. Dikeman*, 192 Colo. 1, 2, 555 P.2d 519, 519 (1976) (it was proper for the trial court to hold an in camera hearing to determine whether the witness "would, in fact, invoke his privilege").

¶ 84 However, " 'the exercise of the privilege is not evidence to be used in the case [b]y any party.' " *Dikeman*, 192 Colo. at 4, 555 P.2d at 520 (quoting *State v. Smith*, 74 Wash.2d 744, 446 P.2d 571, 581 (1968)). Thus, a party may not call a witness to testify before the jury if it "knows the witness will exercise [his or] her privilege against self-incrimination." *People v. Newton*, 940 P.2d 1065, 1067 (Colo.App.1996) (citing *Dikeman*, 192 Colo. at 4, 555 P.2d at 521).

¶ 85 "The privilege against self-incrimination ... continues until a defendant has been sentenced." *People v. Villa*, 671 P.2d 971, 973 (Colo.App.1983) (citing *Steinberger v. Dist. Court*, 198 Colo. 59, 596 P.2d 755 (1979)).

¶ 86 Once a witness indicates that he or she intends to invoke the Fifth Amendment privilege, the trial court must determine whether the witness's refusal to testify is justified. *Smith*, 275 P.3d at 720.

### 2. Marvin Bragg's Motion to Quash

#### a. Background

¶ 87 Bragg, the brother of Daniel Harris, filed a motion to quash the trial subpoena that ordered him to appear and testify. Attached to the motion was his sworn declaration in which he explained that he was a defendant in a pending federal matter for which he had pleaded guilty to conspiracy to distribute cocaine and possession with intent to distribute that drug.

¶ 88 Bragg also stated that several drug charges would remain pending until he was sentenced for the crimes to which he had pleaded guilty. He had not yet been sentenced when he signed his declaration, nor had he yet been granted any type of state or federal immunity. In addition, Bragg stated, "If called as a witness at [defendant's] trial, I will invoke my Fifth Amendment privilege against self-incrimination to all questions asked of me."

¶ 89 In opposing the motion to quash, defense counsel stated, "whether or not [Bragg] does in fact choose to invoke ... [i]t is up to the jurors to decide what role, if any, he had in this." Counsel urged the trial court to have Bragg "presented as a witness" so the jury could "see" him "refuse[ ] to answer questions" about "[t]he events ... that night and his conversations with his brother," Daniel Harris, "so [the jury could] determine ... their view of his credibility."

¶ 90 The trial court inquired whether defense counsel could provide any authority to suggest that the rule stating that "a Court should not require a person to invoke the Fifth Amendment by way of testimony in front of a jury" had changed. Defense counsel responded by saying, "I'm not aware of anything that says it has changed."

¶ 91 The trial court found that Bragg had made it clear, through his declaration, that he would invoke his privilege. Reasoning that it would be improper to force Bragg to invoke the privilege in front of the jury, the court granted the motion to quash.

b. Preservation and Standard of Review

¶ 92 Defense counsel objected to the court's decision on Bragg's motion to quash. However, he did not assert in the trial court, as defendant now does on appeal, that the court should have allowed questioning of Bragg outside the presence of the jury before allowing him to invoke his Fifth Amendment privilege. Thus, we review his contentions under a plain error standard. *See People v. Mares,* 263 P.3d 699, 702–03 (Colo.App.2011).

¶ 93 However, as the court noted in *Smith,* 275 P.3d at 719, no Colorado appellate court has specifically addressed the standard of review for determining whether an error occurs in the situation presented here and the case law from other jurisdictions is conflicting. Some courts hold that review is for an abuse of discretion while others hold that review is de novo. Because our resolution of the issue would be the same regardless of the standard we apply, we will review defendant's contentions de novo. *Id.* at 720.

c. Application

¶ 94 On appeal, defendant contends that the trial court violated his constitutional right to present a defense by refusing to hold an in camera review to subject Bragg to questioning before granting his motion to quash. We do not agree.

¶ 95 The record indicates that defense counsel wanted the jury to see and hear Bragg refusing to answer questions. Presenting Bragg to the jury was necessary, counsel argued, so that the jury could "determine ... their view of his credibility." This line of proposed inquiry is precisely the type of inquiry that is forbidden. *See Newton,* 940 P.2d at 1067 (a party may not call a witness to testify before the jury if it knows the witness will exercise his or her privilege against self-incrimination); *Dikeman,* 192 Colo. at 4, 555 P.2d at 520 ("[T]he exercise of the privilege is not evidence to be used in the case [b]y any party." (internal quotation marks omitted)).

¶ 96 If defense counsel had requested an in camera hearing, the court would likely have been obligated to hold one. *See Dikeman,*

192 Colo. at 2–3, 555 P.2d at 519; *Austin,* 159 Colo. at 449–50, 412 P.2d at 427. But counsel never requested such a hearing. Nor did he question the grounds Bragg stated in his declaration to justify his invocation of the privilege. *Cf. Villa,* 671 P.2d at 972–73 (witness validly invoked his Fifth Amendment privilege where he feared his testimony could be used to enhance his sentence).

¶ 97 Furthermore, counsel did not question Bragg's intent to invoke the privilege. Instead, the trial court's finding that Bragg had "made it clear ... that he intend[ed] to invoke ... the privilege" stood unchallenged.

¶ 98 Under these circumstances, we conclude that the court did not err in granting Bragg's motion to quash. *See Fletcher,* 193 Colo. at 316–17, 566 P.2d at 347 (trial court did not err in refusing to require witness to claim her privilege before the jury where it had determined she would not testify and would instead invoke the privilege).

3. Marquise Harris's Invocation of the Fifth Amendment

a. Background

¶ 99 During its case-in-chief, the prosecution introduced a letter in which defendant appeared to acknowledge his role as the shooter. A police investigator testified that Marquise Harris had given him the letter and that defendant had admitted he wrote the letter.

¶ 100 Before he was called as a witness, Harris, through appointed counsel, filed a motion to quash the subpoena that compelled him to appear and testify in defendant's case on Fifth Amendment grounds. In response, defense counsel requested an inquiry into the basis for Harris's invocation of the privilege. Counsel represented that the only basis that he could see for Harris's invocation of the Fifth Amendment was the questions the defense had "raised throughout th[e] case ... as to the authenticity" of the letter Harris had provided to police.

¶ 101 At the parties' request, the trial court appointed counsel for Harris and ordered Harris to state the grounds for his invocation of the privilege before a different judge in an ex parte hearing. After that

hearing, Harris was ordered to testify because the other court concluded there was no real danger of self-incrimination.

¶ 102 During direct examination, defense counsel attempted to establish that Harris had asked for reward money after disclosing the letter to a local newspaper and the Denver Broncos football team. Defense counsel asked Harris whether he had ever "in [his] life" given "information to the prosecution." In response, Harris asserted his Fifth Amendment privilege and his attorney also objected on those grounds.

¶ 103 At a subsequent bench conference, defense counsel asserted that Harris "has made a pattern of ... creating evidence and disclosing it in an exchange for trying to get a benefit." Defense counsel represented that a prior instance had occurred in connection with a 2001 murder case for which Harris had no criminal exposure.

¶ 104 The trial court inquired why the Fifth Amendment issue was not brought up when the court ordered a hearing before a different judge to address the witness's Fifth Amendment privilege. Defense counsel responded that he had not raised it because the witness had no Fifth Amendment right in this particular instance.

¶ 105 The court sustained Harris's assertion. It reasoned that defense counsel should have indicated his intent to address this issue prior to the ex parte hearing; but had failed to do so. The court also noted that the incident occurred in 2001 and referenced CRE 403.

**b. Preservation and Standard of Review**

¶ 106 The parties agree that defendant properly preserved this issue for appellate review.

¶ 107 We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Beilke*, 232 P.3d at 149. "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair." *Id.*

¶ 108 We review de novo the propriety of a witness's assertion of his or her Fifth Amendment privilege. *See People v. Ruch,*

2013. COA 96, ¶ 43, —— P.3d ——; *Smith,* 275 P.3d at 720.

**c. Law**

¶ 109 "[B]efore a court can compel a response ... in the face of a claim of the privilege, it must be *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." *People v. Razatos,* 699 P.2d 970, 976 (Colo.1985) (emphasis in original) (quoting *Hoffman v. United States,* 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)).

¶ 110 A trial court may exclude relevant evidence "if its probative value is substantially outweighed by ... considerations of undue delay." CRE 403. Although Colorado appellate courts have not directly addressed the "undue delay" provision of CRE 403, the rule "is substantially similar to its federal counterpart, and, therefore, we may look to federal authority for guidance in construing the state rule." *People v. Williams,* 89 P.3d 492, 494 (Colo.App.2003) (citing *Bernal v. People,* 44 P.3d 184 (Colo.2002)).

¶ 111 Under the federal rule, the term "delay" refers to "the prolonging of the length of the trial and can be read properly in conjunction with the other exclusionary factors: waste of time, or needless presentation of cumulative evidence." *United States v. Smithers,* 212 F.3d 306, 316 (6th Cir.2000) (internal quotation marks omitted). Thus, this consideration serves the important function of preserving "a scarce public resource by increasing judicial efficiency." Kenneth W. Graham, Jr., 22A *Federal Practice & Procedure* § 5218 (2d ed.2014).

**d. Application**

¶ 112 Defendant contends that the trial court erred by refusing to permit defense counsel to ask Harris whether he had ever, "in [his] life," given "information to the prosecution." We are not persuaded.

¶ 113 We determine the propriety of a trial court's decision with respect to a witness's invocation of the privilege based upon "the information known to" the trial

court at the time. *Blackwell*, 251 P.3d at 474.

¶ 114 At the outset, we note that the trial court gave defense counsel an opportunity to set forth the issues to be addressed at the ex parte hearing before a different judge. In response, counsel indicated that the only issue was the one that had been "raised throughout th[e] case . . . as to the authenticity" of the letter Harris had provided to police. Counsel did not mention the 2001 incident.

¶ 115 Whether Marquise Harris had a valid claim to the privilege with respect to defense counsel's question was far from clear. *Cf. Razatos*, 699 P.2d at 976 (it must be perfectly clear that a witness's answer cannot possibly incriminate him before the trial court can compel an answer). On the one hand, defense counsel argued that Harris did not have any criminal exposure in the 2001 case. On the other hand, defense counsel alleged Harris had "creat[ed] evidence and disclos[ed] it in exchange for . . . a benefit."

¶ 116 As the prosecutor pointed out, there is no statute of limitations for "any forgery" in Colorado. § 16–5–401(1)(a), C.R.S.2014. And the statute of limitations for perjury "does not begin to run until the criminal act is discovered." *People v. McKinney*, 99 P.3d 1038, 1042 (Colo.2004) (citing § 16–5–401(4.5)(p), C.R.S.2014). Thus, given defense counsel's proffer, it was at least possible that Harris's response could have incriminated him. *Cf. Blackwell*, 251 P.3d at 474 (trial court could not compel an answer where the prosecutor and the witness's attorney indicated witness may have had a valid claim of privilege).

¶ 117 Based on the information before it, the trial court was faced with a dilemma: (1) sustain the invocation of privilege, as it did; or (2) seek out yet another judge to hold an additional ex parte hearing regarding Harris's criminal exposure in the 2001 incident.

¶ 118 We conclude the trial court did not abuse its discretion by deciding to proceed in the manner it did. In his opening brief, defendant claims that the trial court's ruling prevented him from calling into question Harris's credibility as to how he obtained the letter and his motive for disclosing it to police. But the prosecutor had elicited testimony indicating defendant admitted the letter was in his handwriting. And the parties had stipulated that Harris had sought a $100,000 reward as well as monetary payments from a newspaper in exchange for the letter. As a result, the probative value of Harris's prior act was low. *See Saiz*, 32 P.3d at 446 (establishing the probative value of a certain piece of evidence requires consideration of the logical force of the evidence and the proponent's need for it in light of other available evidence).

¶ 119 Further, a second ex parte hearing before a different judge would certainly have prolonged the trial. *See Smithers*, 212 F.3d at 316. Moreover, that amount of delay was "undue" because defense counsel had been given the opportunity to mention the 2001 incident before the ex parte hearing, but had failed to do so. *See* CRE 403 (trial court may exclude relevant evidence due to considerations of undue delay). Hence, we perceive no error.

¶ 120 Concerning the issue of whether the trial court's decision excessively limited defendant's ability to examine Marquise Harris, we reject the contention. The court's limitations were appropriate and within the bounds of its prerogative under the federal and state constitutions.

### D. Daniel Harris's Prior Consistent Statements

¶ 121 Defendant contends the trial court abused its discretion by admitting the entire videotaped interview of Harris as a prior consistent statement. He also asserts that the trial court should have issued a limiting instruction and that the admission of the evidence without such an instruction violated his constitutional rights. We disagree.

#### 1. Preservation and Standard of Review

¶ 122 The parties agree the defendant preserved the trial court's evidentiary ruling for review. We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Welsh*, 80 P.3d 296, 304 (Colo.2003). A trial court abuses its discretion only where its

decision is manifestly arbitrary, unreasonable, or unfair. *Id.*

■ ¶ 123 However, defense counsel did not assert in the trial court that it should issue a limiting instruction or that the trial court's decision to admit the evidence without such an instruction violated defendant's constitutional rights. Accordingly, we will review those contentions for plain error. *See Wilson,* ¶ 31 ("[B]ecause defense counsel never asserted in the trial court that any constitutional right was implicated, we apply the plain error standard of review."); *People v. Griffin,* 224 P.3d 292, 298 (Colo.App.2009) (Because defense counsel "did not request a limiting instruction, we apply the plain error standard of review."). Under that standard, we will reverse only if the defendant "shows that the court committed an obvious and substantial error that undermined the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction." *Griffin,* 224 P.3d at 298.

### 2. Law

■ ¶ 124 In Colorado, a witness's prior consistent statements are admissible under two distinct theories. *See People v. Elie,* 148 P.3d 359, 362 (Colo.App.2006). Under CRE 801(d)(1)(B), such statements may be admitted as substantive evidence if the requirements of that rule are met. *People v. Eppens,* 979 P.2d 14, 20 (Colo.1999). They may also "be used for rehabilitation when a witness' credibility has been attacked, as such statements are admissible outside CRE 801(d)(1)(B)." *Id.* at 21.

¶ 125 Under either theory, "[t]he rehabilitative uses of such statements are still governed by the general principles of relevancy found in CRE 401, 402, and 403." *Id.* at 21–22. Thus, a "trial court must determine whether the statements have some probative force bearing on the credibility of the witness beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his or her trial testimony." *Id.* at 22. The court must also "be mindful of the prohibition against the needless presentation of cumulative evidence." *Id.*

■ ¶ 126 "Determining 'how much of a prior consistent statement is admissible is based upon its relevance and probative use'" which "turns on the scope of impeachment and the attack on the witness's credibility." *People v. Miranda,* 2014 COA 102, ¶ 15, ―― P.3d ―― (quoting *Elie,* 148 P.3d at 362). "'If the impeachment goes only to specific facts, then only prior consistent statements regarding those specific facts are relevant and admissible.'" *People v. Banks,* 2012 COA 157, ¶ 36, ―― P.3d ―― (quoting *Elie,* 148 P.3d at 362) (*cert. granted on other grounds* June 24, 2013). If, however, "the impeachment is general and not limited to specific facts, then the jury should have access to all the relevant facts, including consistent and inconsistent statements." *Elie,* 148 P.3d at 362; *see also People v. Halstead,* 881 P.2d 401, 403 (Colo.App.1994) (citing *People v. Tyler,* 745 P.2d 257, 259 (Colo.App.1987)).

### 3. Application

■ ¶ 127 On appeal, defendant appears to argue that CRE 801(d)(1)(B) provides the only avenue for a court to admit such statements and that the requirements of the rule were not met because there was no claim of "recent fabrication." This argument directly contradicts the supreme court's holding in *Eppens* and we therefore reject it. *See* 979 P.2d at 21 ("We concur with the numerous courts that have concluded that Rule 801(d)(1)(B) was not intended to provide the exclusive avenue for the introduction of prior consistent statements.").

¶ 128 Defendant also argues that the trial court's decision to admit the evidence for rehabilitation was erroneous because the interview contained both consistent and inconsistent statements, as well as statements that were neither consistent nor inconsistent. Therefore, defendant argues, some portions of the videotape were admitted as substantive evidence. This argument ignores the scope of defense counsel's impeachment and attack on Harris's credibility.

¶ 129 At the start of defense counsel's cross-examination, counsel asked Harris whether he had "a habit of telling stories to get [him]self out of trouble?" This question was followed by inquiry into Harris's prior

felony convictions for providing false information to police and prior specific instances in which he had been dishonest with the police officers investigating defendant's case. *Cf. Halstead*, 881 P.2d at 403 (impeachment was a general attack on the witness's credibility where the cross-examination included over thirty references to the witness's prior statements to police).

¶ 130 Defense counsel also extensively cross-examined Harris about the requirements of his plea agreement as well as the benefits he expected to receive if he met those requirements to the prosecution's satisfaction. *Cf. Banks*, ¶ 37 (questioning about the witness's motive to lie brings into question a witness's general truthfulness).

¶ 131 In addition, defense counsel cross-examined Harris on almost every aspect of his account of the crime, including his actions at the nightclub, his relationship with defendant, the interactions between the men in the white Tahoe, who drove the car, who did the shooting and from which angle, what the gun looked like, his actions after the shooting stopped, his conversations with defendant and others in the days following the shooting, and his flight to Mexico. Such a comprehensive examination constitutes a general attack on the credibility of Harris's version of events. *Elie*, 148 P.3d at 363.

¶ 132 We agree with the trial court that because it gave defense counsel extensive leeway to attack Harris's credibility with respect to his testimony in this case and his prior interactions with police officers, admission of the entire video was proper to give the jury the full picture of what he had said to the police. *See Banks*, ¶ 39 ("[A]ll of the prior statements were relevant and admissible to give the jury a complete picture of [the] witnesses' credibility.").

¶ 133 Therefore, we conclude that the trial court did not abuse its discretion by admitting the videotaped interview. *Id.*

¶ 134 Concerning defendant's assertion that the court should have issued a limiting instruction, "[a]s a general rule, defense counsel is charged with the task of deciding whether a limiting instruction is desirable." *People v. Thomas*, 2014 COA 64, ¶ 58, 345 P.3d 959. Absent a statutory requirement, a trial court is under no obligation to issue a limiting instruction sua sponte. *Griffin*, 224 P.3d at 298–99.

¶ 135 Because defense counsel did not request such an instruction and defendant has not pointed us to any case law or statute that requires such an instruction, we discern no error in the lack of an instruction regarding this evidence. *Thomas*, ¶ 59.

¶ 136 We also conclude that the trial court did not err, let alone commit plain error, with respect to defendant's constitutional rights. *See People v. Rincon*, 140 P.3d 976, 981 (Colo.App.2005) (finding no plain error with respect to the defendant's constitutional rights where prior consistent statements were admissible to rehabilitate witness testimony).

### E. Grand Jury Testimony of Unavailable Witnesses

¶ 137 Defendant asserts that the trial court erred in refusing to admit the grand jury testimony of two witnesses, Mario Anderson and Markie Jackson–Keeling, who refused to testify at trial. Defendant did not include in the record the transcript of their testimony before the grand jury, and the motions division of this court denied his request to supplement the record. Under these circumstances, we cannot address his assertion.

#### 1. Background

¶ 138 Both Anderson and Jackson–Keeling, who may have been passengers in the white Tahoe during the shooting, were called as witnesses in the grand jury proceeding that produced the indictment in this case. Apparently, their testimony was favorable to defendant.

¶ 139 After the men were called as witnesses at trial, they declared their intent to invoke their Fifth Amendment rights and refused to testify. The prosecution then granted them immunity and the trial court ordered them to testify. Both men declined to do so and the court held them in contempt.

¶ 140 Defendant then sought to introduce the transcripts of the testimony the men had given before the grand jury under CRE

804(b)(1) ("[I]f the declarant is unavailable as a witness[,] ... [t]estimony given as a witness at another hearing of the same or a different proceeding, [is not excluded by the hearsay rule] ... if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."). The trial court found that both men were unavailable within the meaning of CRE 804(a), but also determined that "the similar motive" requirement of CRE 804(b)(1) had not been satisfied. The court reasoned the motive requirement had not been met because: (1) "the grand jury in this case was used primarily as an investigative tool"; (2) much of the information regarding the men had not come to light before they testified at the grand jury; and (3) the burden of proof at a grand jury proceeding— probable cause—is "an extraordinarily low threshold."

### 2. Analysis

¶ 141 On appeal, defendant argues that the trial court abused its discretion by refusing to admit the grand jury testimony because the prosecution's motive to develop that testimony was similar to the motive it would have held at trial, had the witnesses testified.

¶ 142 But any inquiry as to whether the "similar motive" requirement of CRE 804(b)(1) has been met would, at the very least, require a review of the grand jury testimony. *See United States v. Foster*, 128 F.3d 949, 956 (6th Cir.1997); *United States v. Miller*, 904 F.2d 65, 68 n.3 (D.C.Cir.1990). Defendant has not provided the grand jury testimony that he contends should have been admitted. Therefore, we have no way to review the testimony set forth in those transcripts. *Cf. People v. Wells*, 776 P.2d 386, 390 (Colo.1989) ("It is the defendant's responsibility to designate the record on appeal, including such parts of the trial proceedings as are necessary for purposes of the appeal, and to ensure that the record is properly transmitted to an appellate court." (citing C.A.R. 10(b); *People v. Thompson*, 770 P.2d 1282, 1283 n.1 (Colo.1989); *People v.*

*Velarde*, 200 Colo. 374, 375, 616 P.2d 104, 105 (1980))).

¶ 143 As a result, "the record is insufficient to permit the conclusion that the trial court[ ]" abused its discretion, *id.*, and we therefore cannot review the contention.

### III. Complicity Instruction

¶ 144 Defendant contends that the trial court gave an erroneous jury instruction regarding complicity. We disagree.

### A. Preservation and Standard of Review

¶ 145 The parties agree that defendant adequately preserved this issue for review.

¶ 146 " 'We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law.' " *People v. Reeves*, 252 P.3d 1137, 1139 (Colo.App.2010) (internal quotation marks omitted).

### B. Law

¶ 147 Complicity "is ... a theory by which a defendant becomes accountable for a criminal offense committed by another." *People v. Thompson*, 655 P.2d 416, 418 (Colo. 1982). A person is guilty as a complicitor "if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense." § 18–1–603, C.R.S.2014.

¶ 148 "[U]nder a complicity theory, it is not necessary that any single person commit all the elements of the underlying offense." *Elie*, 148 P.3d at 365. "It is only necessary that the acts of the complicitor and the other actor or actors, together, constitute all acts necessary to complete the underlying offense." *Id.*

¶ 149 "An instruction on complicity may be given when supported by evidence admitted at trial that two or more people engaged jointly in a crime." *People v. Grant*, 30 P.3d 667, 670 (Colo.App.2000). The jury should be instructed that

(1) A crime must have been committed.
(2) Another person must have committed [all or part of] the crime. (3) The defen-

dant must have had knowledge that the other person intended to commit [all or part of] the crime. (4) The defendant must have had the intent to promote or facilitate the commission of the crime. (5) The defendant must have aided, abetted, advised, or encouraged the other person in the commission or planning of the crime. *Bogdanov v. People*, 941 P.2d 247, 254 n.10, *amended*, 955 P.2d 997 (Colo.1997), *abrogated on other grounds by Griego v. People*, 19 P.3d 1, 7 (Colo.2001).

¶ 150 "The language contained in the brackets [noted above] should be included in the complicity jury instruction only in those cases where [two] or more persons, possibly including the defendant, together committed the essential elements of the underlying crime." *Bogdanov*, 955 P.2d at 997.

¶ 151 "[W]hen a defendant charged with a crime under a complicity theory did not actually commit any of the essential elements of the crime, it is error to include the 'all or part of' language in the instruction." *Elie*, 148 P.3d at 365. However, the "all or part of" language is "proper in a case where two or more persons together commit a crime, but neither one committed all the elements of the crime." *Id.*

### C. Application

¶ 152 Here, the trial court gave an instruction that tracked the language of section 18–1–603, as approved by the supreme court in *Bogdanov*, 941 P.2d at 254 n.10, and decided to include the "all or part of" language.

¶ 153 Defendant asserts he "would not have committed any of the essential elements of [the] crime[s]" charged if he "was not the shooter but ... was [instead] the driver." Thus, he argues that the court should not have included the "all or part of" language in the instruction. We disagree.

¶ 154 The jury was presented with evidence that would have supported several scenarios of how the shooting occurred. One scenario was that defendant was solely responsible for the shooting and thus was guilty as a principal. In addition, however, as the trial court noted, the evidence could support the theory that

there were two shooters based on the bullets and the caliber. And we could have seen some unnamed person, either Jackson–Keeling, or Vernone Edwards, sitting in the passenger side of the front seat, Daniel Harris in the back, and/or flip those. And those two as the shooters and one of those may have used [defendant's] .40 caliber handgun, and [defendant] drove for the express purpose of getting this drive-by shooting to happen.

¶ 155 If the jury believed this latter view, and it found that all other elements of the complicity instruction had been proved, it could have legitimately found defendant guilty of murder, because the "all or part of" language "should be included in the complicity jury instruction ... where [two] or more persons, possibly including the defendant, together committed the essential elements of the underlying crime." *Bogdanov*, 955 P.2d at 997.

¶ 156 In this case, causation was one of the elements of first degree murder (extreme indifference), first degree murder (after deliberation), and second degree assault. The trial court properly instructed the jury that the term " 'cause' means that act ... which in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have been incurred." *See People v. Moreland*, 193 Colo. 237, 242 n.11, 567 P.2d 355, 359 n.11 (1977).

¶ 157 If the jury's analysis tracked the scenario set forth by the trial court, it could have reasonably concluded that defendant intentionally gave his .40 caliber handgun to the shooter and drove the white Tahoe with the express purpose of facilitating the shooting. Because these acts would have been acts without which the injuries sustained by the victims would not have occurred, the jury could have concluded that defendant caused the injuries. *Cf. State v. Smith*, 651 So.2d 890, 899–900 (La.Ct.App.1995) (driver in drive-by shooting possessed requisite specific intent and knowledge to be held liable as a complicitor where he turned the car lights off and drove slowly past the targeted house);

*People v. Turner,* 125 Mich.App. 8, 336 N.W.2d 217, 218–19 (1983) (the defendant could be held liable as a complicitor where he supplied the principal with the firearm used and directed the principal to aim the gun at the victim).

¶ 158 Therefore, the trial court did not err by including the "all or part of" language with respect to the crimes set forth above. *See Bogdanov,* 955 P.2d at 997.

¶ 159 Concerning attempted first degree murder (extreme indifference), that crime does not require proof of causation. *See People v. Torres,* 224 P.3d 268, 277–78 (Colo. App.2009) (citing §§ 18–2–101, 18–3–102(1)(d), C.R.S.2014). Instead, a person is guilty of attempted first degree murder (extreme indifference) if he or she "knowingly" acts with "an attitude of universal malice manifesting extreme indifference to the value of human life" and takes "a substantial step toward the commission of" murder. *Id.* at 276. "A substantial step is 'any conduct that is strongly corroborative of the actor's criminal objective.'" *Miranda,* ¶ 76 (quoting *People v. Lehnert,* 163 P.3d 1111, 1113 (Colo. 2007)).

¶ 160 But even so, the jury could have reasonably determined that defendant's actions as the driver of the white Tahoe constituted a substantial step towards the commission of first degree murder (extreme indifference). *Cf. Lehnert,* 163 P.3d at 1115 ("[S]earching out a contemplated victim ... [is a] useful example[ ] of conduct considered capable of strongly corroborating criminal purpose."). And it could have also concluded that others within the car also took substantial steps towards the commission of the crime. *Cf. People v. Jackson,* 972 P.2d 698, 701 (Colo.App.1998) (the defendant's substantial step "need not be the last proximate act necessary to complete the offense."). Therefore, the jury could have reasonably concluded defendant and at least one other person committed the essential elements of attempted first degree murder (extreme indifference).

¶ 161 Accordingly, we conclude that the trial court properly included the "all or part of" language in the jury instruction regarding complicity. *See Bogdanov,* 955 P.2d 997;

*see also Elie,* 148 P.3d at 365 (To be held liable as a complicitor "[i]t is only necessary that the acts of the complicitor and the other actor or actors, together, constitute all acts necessary to complete the underlying offense.").

## IV. Prosecution's Knowing Use of False Evidence

¶ 162 Defendant makes two related contentions that stem from his assertion that Daniel Harris was the shooter. First, he contends that the prosecution violated his due process rights because it knowingly used Harris's false evidence to obtain his conviction. Second, he contends the prosecution improperly argued inconsistent factual theories. The People respond that we lack jurisdiction to review these contentions. We conclude that we have jurisdiction to review the contention but nevertheless determine that defendant's claims fail.

### A. Jurisdiction

¶ 163 Relying upon *People v. Bergen,* 883 P.2d 532 (Colo.App.1994), the People assert that, as a statutory court, we do "not possess general powers of supervision over lower courts or attorneys appearing therein, except for the ability to issue 'any writs, directives, orders, and mandates necessary to the determination of cases within [our] jurisdiction,'" and thus, we lack jurisdiction to address defendant's contention. *Id.* at 542 (quoting § 13–4–102(3), C.R.S.2014); *see also* Colo. Const. art. VI, § 2(1) ("The supreme court ... shall have general superintending control over all inferior courts."). They assert that defendant's contentions ask us to exercise control over the district court, which only the Colorado Supreme Court may do. We disagree.

¶ 164 In *Bergen,* the defendant asserted that the prosecution had committed misconduct in its handling of the grand jury, and requested dismissal of the indictment under a theory of outrageous governmental conduct. A division of this court stated that "a supervisory power of this court to sanction prosecutorial misconduct by ordering the dismissal of an indictment is uncertain," and

that, even if there were such a supervisory power, dismissal of the indictment was unwarranted. *Id.* The division then addressed and rejected the defendant's contention that the behavior of government agents was so outrageous as to violate fundamental fairness and to shock the universal sense of justice. *Id.* (citing *People v. Auld*, 815 P.2d 956 (Colo. App.1991)).

¶ 165 *Bergen* is inapposite because defendant is not requesting dismissal of the indictment, nor is he requesting relief based on any supervisory power possessed only by the supreme court. Instead, defendant seeks reversal of the judgment of conviction and remand for a new trial, relief that this court is statutorily authorized to provide. § 13–4–102(1).

### B. Preservation and Standard of Review

¶ 166 Defendant did not preserve either of these contentions for appellate review. Therefore, we review them for plain error. *People v. Miller*, 113 P.3d 743, 749–50 (Colo. 2005).

### C. Law

¶ 167 "It is fundamental that prosecutors may not present or allow perjured testimony." *People v. Medina*, 260 P.3d 42, 48 (Colo.App.2010) (collecting cases). "False testimony, when knowingly used, or when used recklessly or without regard or inquiry as to the truth of the facts asserted, is a due process violation that requires reversal." *People v. Dunlap*, 124 P.3d 780, 807 (Colo.App.2004) (citing *DeLuzio v. People*, 177 Colo. 389, 494 P.2d 589 (1972)).

¶ 168 Appellate courts in this state have not established a test to determine whether a defendant's constitutional rights are violated by the prosecution's use of perjured testimony. However, "[u]nder federal case law, [a] defendant must show three things: first, that the prosecution's case included perjured testimony; second, that the prosecution knew or should have known of the perjury; and third, that the perjury was material." *Medina*, 260 P.3d at 48 (citing *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir.1995); *United States v. Duke*, 50 F.3d 571, 577–78 (8th Cir.1995)).

¶ 169 "The first two requirements ... are heavily fact dependent." *Id.* "Because those issues normally cannot be resolved from a cold trial record, these types of claims 'usually' must be 'made on a collateral attack.'" *Id.* (quoting *United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir.1993)).

¶ 170 "A person commits perjury in the first degree if in any official proceeding he knowingly makes a materially false statement, which he does not believe to be true, under an oath required or authorized by law." § 18–8–502(1), C.R.S.2014.

¶ 171 "Due process does not preclude a prosecutor from advancing alternative theories upon which a jury properly could convict one defendant in one trial." *Medina*, 260 P.3d at 50. "Issues of inconsistency [that] arise within a single trial ... do not threaten the basic fairness of the process" because "the fact finder can weigh inconsistent alternatives in the context of the whole case." Anne Bowen Poulin, *Prosecutorial Inconsistency, Estoppel and Due Process: Making the Prosecution Get Its Story Straight*, 89 Calif. L.Rev. 1423, 1429 (2001). Thus, alternative legal theories do not constitute inconsistent legal theories. *See Medina*, 260 P.3d at 50.

### D. Application

¶ 172 Contrary to defendant's assertions, we cannot conclude Harris committed perjury in his testimony on the record before us.

¶ 173 In his opening brief, defendant argues that Harris's testimony was not supported by the physical evidence or was in direct conflict with the testimony of other witnesses. For example, defendant asserts that Harris was "insistent there was only one weapon involved." That is true. But on direct examination, Harris testified that he could not "say for certain" whether or not the front seat passenger was also firing a weapon. And on cross-examination Harris testified that he had only "seen one" handgun.

¶ 174 With respect to the events inside and immediately outside of the nightclub, defendant argues that Harris perjured himself

when he claimed that he "did not remember" being in any altercations because the videotaped surveillance footage showed otherwise.

¶ 175 Whether Harris was honest when he said he had only "seen one" gun and that he "did not remember" being involved in any altercations at the club involves credibility determinations. *Cf. United States v. Harris*, 751 F.3d 123, 127 (3d Cir.2014) (assessment of the defendant's sincerity hinged on his demeanor and reaction to a surveillance video). "It is the function of the [trier of fact], and not the reviewing court, to weigh evidence and determine the credibility of the witnesses." *People v. Pitts*, 13 P.3d 1218, 1221 (Colo.2000).

¶ 176 Accordingly, we cannot conclude as a matter of law that Harris committed perjury. Hence, we perceive no error by the trial court, let alone plain error, in not sua sponte finding a due process violation.

¶ 177 We also conclude that the trial court did not err, let alone commit plain error, by allowing the prosecution to present alternative legal theories in this single trial involving this single defendant. *See, e.g., Erwin v. People*, 126 Colo. 28, 30–31, 245 P.2d 1171, 1172 (1952) (because the prosecution charged the defendant as a principal, but evidence was introduced that he may have aided, abetted, or assisted in the crime instead, it was proper for the jury to decide whether the defendant participated as a principal or an accessory); *People v. Hall*, 60 P.3d 728, 730 (Colo.App.2002) ("[The] trial court did not err in permitting the prosecution to present evidence that defendant committed first degree murder after deliberation either as a complicitor or as a principal.").

## V. Motion for New Trial Based on Juror Misconduct

¶ 178 Defendant asserts that certain jurors' actions occurring during trial constitute juror misconduct. He contends that his convictions must be reversed, or, in the alternative, that we must remand the case for a hearing. We conclude that a remand is required.

### A. Preservation

¶ 179 As a threshold issue, defendant asserts that he adequately preserved this issue by filing a motion for a new trial under Crim. P. 33(a). The People, however, contend that we should not consider defendant's arguments because he did not timely file that motion. We first address and reject the People's contention.

#### 1. Standard of Review

¶ 180 Interpretation of court rules and statutes are "questions of law, which we review de novo." *Gleason v. Judicial Watch, Inc.*, 2012 COA 76, ¶ 14, 292 P.3d 1044.

#### 2. Law

¶ 181 As relevant here, Crim. P. 33(c) provided at the time that "a motion for a new trial ... shall be filed within 15 days" (amended to 14 days in 2011) "after verdict or finding of guilt or within such additional time as the court may fix during the 15–day period." The People rely on the language stating that a court may fix additional time but only if it does so "during the 15–day period," arguing that no extension of time beyond any extension originally granted may occur. In support of their contention, the People rely upon *People in Interest of Iuppa v. District Court*, 731 P.2d 723, 724 (Colo. 1987).

¶ 182 In *Iuppa*, the trial court had received and accepted a guilty verdict on June 5, 1986, relating to robbery charges against the defendant. The trial court allowed the defendant thirty days to file a motion for new trial. At the sentencing hearing on July 14, thirty-nine days after the verdict date, defense counsel stated he had intentionally not filed a motion for new trial. Even so, the court granted him an additional week to file such a motion.

¶ 183 The defendant filed a motion for judgment of acquittal or new trial within the one-week period. The trial court initially ruled that it had lost jurisdiction to consider the defendant's motion, but later changed its ruling and decided that it retained jurisdiction over the new trial motion. The court then granted it.

¶ 184 The District Attorney sought review from the supreme court under C.A.R. 21, which issued a rule to show cause to determine whether the court "acted without and in excess of jurisdiction when it granted the motion for new trial." The supreme court stated, in its discussion of Crim. P. 33:

> Crim. P. 33(c), as amended, is clear as to the time limit placed upon a motion for new trial, and Crim. P. 33(b) is clear as to the jurisdictional requirement when the court orders a party to file a motion for a new trial. Here, the court initially granted the defendant thirty days within which to file his motion for new trial, thereby extending the fifteen day period. Such an extension is proper under Crim. P. 33(c) because it was set "during the fifteen day period." Thirty-nine days then expired, and the court granted the defendant additional time to file the motion for new trial. The rule clearly prohibits the subsequent extension of time because it was granted after the original fifteen day period had expired.

*Iuppa*, 731 P.2d at 725. The supreme court therefore reversed the trial court's grant of a new trial.

¶ 185 In our view, *Iuppa* is distinguishable from the circumstances present here for several reasons.

¶ 186 First, the decision does not address Crim. P. 45, which deals with time issues in criminal cases. That rule provides for enlargement of time periods in subsection (b) and states, in pertinent part:

> When an act is required or allowed to be performed at or within a specified time, the court for cause shown may at any time in its discretion:
>
> (1)  With or without motion or notice, order the period enlarged if application therefor is made before expiration of the period originally prescribed or of that period as extended by a previous order; or
>
> (2)  Upon motion, permit the act to be done after expiration of the specified

period if the failure to act on time was the result of excusable neglect.

Crim. P. 45(b).

¶ 187 Thus, under the plain language of Crim. P. 45(b)(1), a court retains discretion to "order [a] period enlarged" if *either* (1) a request therefor is made *before* the expiration of the original period; *or* (2) a request is made during a period that has been extended by a previous order.

¶ 188 *Iuppa* did not address the application of Crim. P. 45(b)(1). Indeed, all that case said was that Crim. P. 33(c) "clearly prohibits the subsequent extension of time because it was granted after the original fifteen day period had expired." 731 P.2d at 725. It appears that no party raised the application of Crim. P. 45(b)(1), even though other existing precedent had held that the filing requirements of Crim. P. 33 were tempered by Crim. P. 45. *See, e.g., People v. Dillon*, 655 P.2d 841, 844 (Colo.1982) ("In Colorado the filing requirements set forth in Rule 33 are ... tempered by Rule 45."); *People v. Moore*, 193 Colo. 81, 82, 562 P.2d 749, 750 (Colo.1977) ("Rule 33(b) provides for extensions of time only if requested before the time for filing has expired. That rule is tempered, however, by Rule 45(b)."); *People v. Masamba*, 39 Colo.App. 197, 199, 563 P.2d 382, 383 (1977) (the defendant may show late filing of his motion for a new trial was the result of excusable neglect).

¶ 189 Second, in *Iuppa*, the motion for new trial was filed *after* the expiration of the thirty-day period originally granted by the court. Thus, the supreme court had no reason to address the provision in Crim. P. 45(b)(1) because defendant had not made a request for an enlargement before the end of the original thirty-day period, nor had the court granted any extension of that thirty-day period. The court mentioned, in passing, that there was no excusable neglect asserted in the case, thus acknowledging that the only provision available to the defendant there arose under Crim. P. 45(b)(2), which allows a filing if the moving party can demonstrate excusable neglect.

¶ 190 Accordingly, *Iuppa* does not control our analysis.

### 3. Application

¶ 191 Here, the People argue that (1) the jury found defendant guilty on March 11, 2010; (2) under Crim. P. 33(c), his motion for new trial was due within fifteen days or within such additional time as the trial court fixed during that fifteen-day period; (3) the court therefore only had until Friday, March 26, to fix a different time period and it did not do so until March 29. Thus, they contend, all the extensions from March 26 to March 29 and from March 29 to April 19 were not authorized by Crim. P. 33. We disagree.

¶ 192 The court's enlargements of time were permissible under Crim. P. 45(b)(1). The jury returned its guilty verdicts on March 11, 2010. On March 25, within the fifteen-day period allowed under Crim. P. 33, the prosecution filed a motion for additional time to file posttrial motions, specifically requesting an order "directing the defense to file any post[ ]conviction/pre-sentencing motions on or before April 16, 2010 at 5:00 p.m."

¶ 193 On March 26, 2010, still within the fifteen-day period, defendant filed a motion asking the trial court to "clarify that the deadline requested by the [p]rosecution for all post[ ]trial motions includes any motion for a new trial."

¶ 194 On March 29, 2010, the trial court acknowledged receipt of both motions, stated that it was "fully advised," and extended the posttrial motions deadline to April 16, 2010. Thereafter, the trial court extended the deadline to April 19, 2010, after receiving and granting defendant's motion for extension filed on April 16, 2010. Defendant filed his motion for a new trial on April 19, 2010.

¶ 195 The prosecution's request for enlargement beyond the fifteen-day period was made before the expiration of the original fifteen-day period. Hence, the court was authorized to, and did, grant an extension. *See* Crim. P. 45(b)(1). The court also had authority to grant the later requests that were made during the periods that had been extended by the court's March 29 and April 16 orders. *See id.*

¶ 196 Contrary to the People's contention, it was not necessary for the court to actually grant the prosecution's motion to extend the deadline before the fifteen-day period expired. Crim. P. 45 states that the predicate for enlargement is the filing of an application (that is, a request) for enlargement within the appropriate period, not the actual granting of the extension.

¶ 197 We therefore conclude that defendant's new trial motion was timely.

### B. Admissibility of Affidavit

¶ 198 Defendant attached an affidavit signed by his investigator to his motion for a new trial. The People argue that the trial court properly denied defendant's motion because defendant never established the truth of the hearsay allegations contained in the affidavit. We reject the People's contentions.

### 1. Background

¶ 199 In the affidavit, the investigator asserted that she interviewed an alternate juror after the juror had been dismissed at the conclusion of trial. As discussed in greater detail below, the alternate juror told her that some members of the jury had engaged in juror misconduct.

### 2. Standard of Review

¶ 200 "When confronted with allegations of irregularity in the jury's proceedings, the trial judge has broad discretion to determine what manner of hearing, *if any*, is warranted." *People v. Mollaun*, 194 P.3d 411, 416 (Colo.App.2008) (internal quotation marks omitted; emphasis in original). Thus, we review posttrial rulings regarding juror misconduct for an abuse of discretion. *People v. Pena–Rodriguez*, 2012 COA 193, ¶ 13, —— P.3d —— (*cert. granted in part* Aug. 19, 2013). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, unfair, or based on an erroneous view of the law. *Id.*; *see also People v. Hopper*, 284 P.3d 87, 92 (Colo.App.2011).

### 3. Law

¶ 201 Hearsay is an out-of-court statement that is offered to prove the truth of the matter asserted. CRE 801(c). Unless an

exemption or exception applies, hearsay is not admissible. CRE 802.

¶ 202 Three divisions of this court have previously held that "a defendant must establish the truth of the allegations on which he bases his motion for a new trial," and the "[f]ailure to establish the truth of hearsay allegations contained in an affidavit will warrant denial of a motion for new trial based on alleged juror misconduct." *People v. Rogers*, 706 P.2d 1288, 1291 (Colo.App.1985); *accord People v. Hernandez*, 695 P.2d 308, 311 (Colo.App.1984); *People v. Stephens*, 689 P.2d 666, 668 (Colo.App.1984).

¶ 203 However, the supreme court has suggested that the presence of hearsay in an affidavit alleging juror misconduct should not preclude a court from considering the substance of the affidavit.

¶ 204 In *Aldrich v. District Court*, 714 P.2d 1321, 1323 (Colo.1986), the supreme court addressed the issue in the context of C.R.C.P. 59 and rejected the notion that a court should automatically strike an affidavit containing hearsay. *Id.* Instead, the court determined that it was appropriate for the trial court to consider an affidavit that sets forth "factual allegations" that are "not conclusory in nature" and which "detail[s] the information acquired" by the affiant in "conversations with" the triers of fact. *Id.* Consideration of such an affidavit is appropriate, the court held, because it indicates the party moving for a new trial "acted upon a basis of knowledge, not merely suspicion or hope." *Id.*

¶ 205 In *Wiser v. People*, 732 P.2d 1139, 1140 (Colo.1987), the defendant presented the affidavits of a bailiff and his defense counsel regarding their conversations with jurors to support his motion for a new trial based on juror misconduct. After setting forth a new test to determine when juror misconduct requires reversal (discussed below), the supreme court reviewed the affidavits. *See id.* at 1143. The court "[c]onsider[ed] the reasonable inferences" that could "be drawn from the affidavits" in a light most favorable to the defendant and held that reversal was not required based upon the specific facts alleged. *Id.*

■ . ¶ 206 The court's reasoning in *Aldrich* and the analysis it undertook in *Wiser* indicate that a trial court should not disregard and cast aside an affidavit alleging juror misconduct solely because that affidavit contains hearsay. Instead, the trial court should determine whether the affidavit sets forth "factual allegations" that are not "conclusory in nature" to the extent that it can be reasonably said that the party moving for a new trial "acted upon a basis of knowledge, not merely suspicion or hope." *Aldrich*, 714 P.2d at 1323.

¶ 207 To the extent other divisions of this court have disagreed with this conclusion, we decline to follow them in this instance. *See Stokes v. Denver Newspaper Agency, LLP*, 159 P.3d 691, 695 (Colo.App.2006) (decision of one court of appeals division is not binding on another division).

### 4. Application

■ ¶ 208 The investigator's affidavit unquestionably contains hearsay, as it sets forth out-of-court statements made by the alternate juror to the investigator, and defendant offers those statements to prove that various types of juror misconduct occurred. *See* CRE 801(c). However, the affidavit presented was specific as to at least some of the jurors involved, and it identifies what types of misconduct may have occurred, when it occurred, and where it occurred. *Cf. Pena–Rodriguez*, ¶¶ 6, 9 (trial court held an evidentiary hearing regarding potential juror misconduct when the defendant provided affidavits from defense counsel alleging the "who, what, when, and where of the allegation" based on its conversations with jurors (internal quotation marks omitted)).

¶ 209 Thus, the affidavit set forth specific "factual allegations" that were "not conclusory in nature" and provided "detail[ed] ... information acquired" by the affiant in her "conversations with the" alternate juror. *Aldrich*, 714 P.2d at 1323; *cf. Rogers*, 706 P.2d at 1291 (suggesting affidavit might have been factually specific enough if it had identified the juror reporting the misconduct).

¶ 210 As we discuss further in the sections that follow, the affidavit also set forth allega-

tions that did not necessitate inquiry into the jury's deliberative process. *Cf. Black v. Waterman*, 83 P.3d 1130, 1138 (Colo.App. 2003) (remanding action for evidentiary hearing where juror's affidavit regarding another juror's statements set forth allegation that the trial court could inquire into under CRE 606(b)).

¶ 211 Therefore, we reject the People's contention that we should decline to review the merits of defendant's argument solely because of the hearsay contained in the affidavit. *Aldrich*, 714 P.2d at 1323. To the extent the trial court did not consider the allegations set forth in the affidavit when it denied defendant's motion for a new trial without a hearing, we conclude that it erred. *Cf. Destination Travel, Inc. v. McElhanon*, 799 P.2d 454, 457 (Colo.App.1990) ("[T]he statements attributed to the jurors in the affidavits" of defendant's attorney "are admissible ... on the question of whether the jury discussed or considered matters beyond the evidence admitted at trial." (citing *Aldrich*, 714 P.2d at 1323)).

### C. Necessity of a Hearing on Juror Misconduct

¶ 212 Defendant contends that the allegations set forth in the investigator's affidavit are sufficient to require a new trial. In the alternative, defendant requests that this matter be remanded for an evidentiary hearing. We conclude that defendant has not sufficiently proved, without a hearing, the allegations set forth in the affidavit so as to warrant a new trial. However, we agree that a hearing is required.

### 1. Background

¶ 213 According to the investigator's affidavit, the alternate juror told her:

- The alternate and two other jurors (at least one of whom was a deliberating juror) became friends during the course of trial and would walk to the Parkway Condominiums nearly every day for lunch. During their walk, the jurors would discuss the testimony offered at trial "and voted on whether [defendant] was guilty or not guilty."

- Other unidentified jurors had decided defendant was guilty while the evidence was still being presented at trial.

- On at least one occasion, the alternate and two other jurors went to the Parkway Condominiums to watch cars drive by on Speer Boulevard when it was dark. The purpose of the jurors' activity was to see whether "they could tell the colors of the cars." The jurors "could definitely tell 'white' and 'not white.'"

- After deliberations had begun, the alternate juror (who had been dismissed) and a deliberating juror travelled to the deliberating juror's home. "The two of them discussed what was going on during deliberations" and the deliberating juror told the alternate that the jury thought defendant was guilty. At the conclusion of their conversation, the alternate told the deliberating juror to stick with what he believed and to hang the jury if necessary. The deliberating juror said that he planned to do so.

¶ 214 In denying defendant's motion for a new trial, the trial court did not make any findings of fact but concluded that the motion failed to satisfy defendant's burden on its face.

### 2. Standard of Review

¶ 215 We review posttrial rulings regarding juror misconduct for an abuse of discretion. *Pena-Rodriguez*, ¶ 13. A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, unfair, or based on an erroneous view of the law. *Id.*

¶ 216 A trial court's denial of a motion for a new trial based on the jury's exposure to extraneous information presents a mixed question of law and fact. *See People v. Harlan*, 109 P.3d 616, 624 (Colo.2005); *People v. Garrison*, 2012 COA 132, ¶ 35, 303 P.3d 117. "We review de novo the court's conclusions of law, but review the court's findings of fact for an abuse of discretion." *Garrison*, ¶ 35.

### 3. Law

#### a. General Principles

¶ 217 The Due Process Clauses of the United States and Colorado constitutions guarantee every criminal defendant a right to trial by an impartial jury. U.S. Const. amends. VI, XIV; Colo. Const. art. II, §§ 16, 25; *Dunlap*, 173 P.3d at 1081. "Due process is satisfied by a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *People v. Dahl*, 160 P.3d 301, 304 (Colo.App.2007) (internal quotation marks omitted).

¶ 218 Nevertheless, there are limits to a trial court's ability to inquire into allegations of juror misconduct. "CRE 606(b) applies to all civil and criminal cases[,]" *Stewart in Interest of Stewart v. Rice*, 47 P.3d 316, 321 (Colo.2002), and "generally bars juror testimony concerning jury deliberations," *Garrison*, ¶ 36. Specifically, challenges to the validity of a verdict may not be based upon: (1) any issue or statement that occurred during the course of deliberations; (2) the effect of anything upon any juror's deliberations; or (3) a juror's mental processes related to the jury's verdict. *See* CRE 606(b); *see also Pena–Rodriguez*, ¶ 27. "This limitation protects the finality of verdicts and allows jurors to deliberate without fear of reprisal, coercion, or criticism." *Pena–Rodriguez*, ¶ 27 (citing *Stewart*, 47 P.3d at 322; *People v. Kriho*, 996 P.2d 158, 167 (Colo.App.1999)).

¶ 219 CRE 606(b) contains three exceptions, two of which are relevant here. First, a juror may testify as to "whether extraneous prejudicial information was improperly brought to the jurors' attention." CRE 606(b)(1). Second, a juror may testify as to "any outside influence that was improperly brought to bear on any juror." CRE 606(b)(2).

#### b. Extraneous Information

¶ 220 Under CRE 606(b)(1), "a court will set aside a verdict ... because jurors were improperly exposed to extraneous prejudicial information where the defendant demonstrates (1) that extraneous information was before the jury and (2) 'a reasonable possibility that the extraneous information would affect the verdict of a typical jury to the defendant's detriment.'" *Garrison*, ¶ 36 (quoting *People v. Holt*, 266 P.3d 442, 446 (Colo.App.2011)).

¶ 221 "Generally, an evidentiary hearing should be held to determine whether extraneous prejudicial information was in fact communicated to the jury." *Destination Travel, Inc.*, 799 P.2d at 457 (citing *Wiser*, 732 P.2d at 1143); *cf. Kendrick v. Pippin*, 252 P.3d 1052, 1063 (Colo.2011) (concluding an evidentiary hearing was not required because affidavit alleging juror misconduct relied exclusively on the jury's exposure to principles derived from the juror's personal background), *abrogated on other grounds by Bedor v. Johnson*, 2013 CO 4, ¶ 22, 292 P.3d 924.

¶ 222 Information is not extraneous if it was "part of the juror's background, gained before the juror was selected to participate in the case and not as the result of independent investigation into a matter relevant to the case." *Kendrick*, 252 P.3d at 1066. However, any information that was not part of the juror's background and was "not properly received into evidence or included in the court's instructions is extraneous to the case and improper for juror consideration." *Harlan*, 109 P.3d at 624.

¶ 223 Thus, any "'legal content [or] specific factual information learned from outside the record [that is] relevant to the issues in a case constitute[s] extraneous prejudicial information improperly before a jury.'" *Holt*, 266 P.3d at 445 (quoting *Kendrick*, 252 P.3d at 1064).

¶ 224 To determine whether extraneous information reached the jury, the court may consider evidence "regarding the source of the extraneous information, the manner of its acquisition, its content, and its presence and use in the jury room during deliberations" because such evidence "is admissible under ... CRE 606(b)." *Harlan*, 109 P.3d at 625.

¶ 225 "If the court's fact-finding, as guided by CRE 606(b), shows that jurors

improperly considered extraneous information, a reversal of the verdict may be required if the defendant was prejudiced." *Id.* "[The] defendant bears the burden of proving that the extraneous information posed a reasonable possibility of prejudice to him." *Holt,* 266 P.3d at 447 (citing *Kendrick,* 252 P.3d at 1064).

¶ 226 " '[T]he term "reasonable possibility" describes a degree of likelihood and implies a realistic possibility that the communication would influence the verdict of a typical juror.' " *Id.* (quoting *People v. Wadle,* 97 P.3d 932, 937 (Colo.2004)); *see also Ravin v. Gambrell By and Through Eddy,* 788 P.2d 817, 821 (Colo.1990) (The question is whether the information "had the capacity to" influence the jury's decision not whether it "actually influenced a particular juror.").

¶ 227 The supreme court has identified a number of non-exclusive factors that are helpful in determining whether the requisite degree of prejudice exists. *See Harlan,* 109 P.3d at 626. Those factors are:

(1) how the extraneous information relates to critical issues in the case; (2) how authoritative is the source consulted; (3) whether a juror initiated the search for the extraneous information; (4) whether the information obtained by one juror was brought to the attention of another juror; (5) whether the information was presented before the jury reached a unanimous verdict; and (6) whether the information would be likely to influence a typical juror to the detriment of the defendant.

*Id.*

### c. Premature Deliberations and Outside Influences

¶ 228 While the law regarding extraneous information is well-settled, appellate courts in Colorado have rarely addressed a claim of juror misconduct premised on premature deliberations.

¶ 229 A division of this court has held that a defendant must establish that premature deliberations actually caused prejudice to obtain a new trial. *See People v. Renaud,* 942 P.2d 1253, 1257 (Colo.App.1996); *but see Wadle,* 97 P.3d at 937 (suggesting an objective

test should apply to determinations of prejudice from juror misconduct).

¶ 230 Beyond the general principle announced in *Renaud,* appellate courts in Colorado have only addressed situations in which the trial court failed to consider pre-deliberation discovered during trial, *People v. Harmon,* 284 P.3d 124, 128–29 (Colo.App.2011), or issued an instruction that allowed pre-deliberation, *see People v. Flockhart,* 2013 CO 42, ¶ 15, 304 P.3d 227. Critical to our analysis, Colorado courts have not addressed the permissible scope of a trial court's inquiry into premature deliberation by the jury that is discovered postverdict.

¶ 231 Therefore, we turn to federal authority to guide our analysis. *See Stewart,* 47 P.3d at 321 (Because CRE 606 is substantially similar to its federal counterpart, "we may look to the federal authority for guidance in construing our rule.").

¶ 232 Federal courts draw a line between "internal" and "external" influences on a jury. *See Tanner v. United States,* 483 U.S. 107, 117–18, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). "Although premature discussions among jurors may prejudice the defendant, . . . intrajury misconduct generally has been regarded as less serious than extraneous influences on the jury." *United States v. McVeigh,* 153 F.3d 1166, 1186 (10th Cir.1998) (collecting cases), *disapproved of on other grounds by Hooks v. Ward,* 184 F.3d 1206, 1226 (10th Cir.1999).

¶ 233 Accordingly, the interest in "[p]reserving the finality of jury verdicts militates strongly in favor of barring post-trial juror assertions of pre-deliberation discussion." *United States v. Williams–Davis,* 90 F.3d 490, 505 (D.C.Cir.1996); *see also United States v. Gigante,* 53 F.Supp.2d 274, 278 (E.D.N.Y.1999) (denying motion to interview jurors despite testimony that indicated the jurors had discussed the merits of the case during trial); *United States v. Piccarreto,* 718 F.Supp. 1088, 1092 (W.D.N.Y.1989) ("[E]ven if [pre-deliberation] conversations on the merits occurred, it would be improper under Rule 606(b) to engage in extensive inquiry as to how these comments affected the jurors during deliberations.").

¶ 234 However, Rule 606(b) does not completely preclude review of the statements made by jurors during premature deliberations. *See United States v. Farmer,* 717 F.3d 559, 565 (7th Cir.2013). And "[p]robing such premature discussions is neither impermissible nor impossible." *United States v. Jadlowe,* 628 F.3d 1, 20 (1st Cir.2010).

¶ 235 In *Farmer,* the court addressed a situation in which "jurors engaged in premature deliberation or made pre-deliberation statements indicating they had already made up their minds" as to the defendant's guilt. 717 F.3d at 565. The court reasoned that, under Rule 606(b), a district court may not consider "whether and how such statements ... affected actual deliberations and verdicts," but may consider "evidence of the statements or conduct" in determining whether the defendant was prejudiced. *Id.*

¶ 236 Thus, "the court must ignore any evidence about the supposed actual effects of the statements or conduct ... and must rely instead on precedent, experience, and common sense to gauge whether the statements or conduct" were prejudicial. *Id.*

¶ 237 In determining whether the statements or conduct were prejudicial, "[t]he important thing is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury." *United States v. Klee,* 494 F.2d 394, 396 (9th Cir.1974); *see also United States v. Martinez,* 547 Fed. Appx. 559, 562 (5th Cir.2013) (the defendant did not establish an abuse of discretion where inquiry into jury's pre-deliberations revealed the discussions were attempts to clarify what they had heard and did not result in a decision as to guilt). "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Klee,* 494 F.2d at 396.

¶ 238 Federal courts have also noted that an alternate juror may become an "outsider who influenced the jury" at the point formal deliberations begin and the alternate is dismissed. *See United States v. Cuthel,* 903 F.2d 1381, 1383 (11th Cir.1990); *see also United States v. Lawrence,* 477 F.Supp.2d 864, 874 (S.D.Ohio 2006) (same), *vacated in*

*part,* 555 F.3d 254 (6th Cir.2009). Where there is evidence that an excused alternate juror has contacted a deliberating juror, the trial court may inquire into the interaction to determine whether the alternate exerted an improper outside influence on the deliberating juror. *See United States v. Prosperi,* 201 F.3d 1335, 1340 (11th Cir.2000).

### 4. Application

¶ 239 We conclude that this matter must be remanded for an evidentiary hearing regarding the potential juror misconduct that occurred in defendant's case. Defendant has put forth competent evidence, in the form of an affidavit, which indicates prejudicial extraneous information may have been before the jury. *See Kendrick,* 252 P.3d at 1066 (implying affidavit contains competent evidence sufficient to warrant an evidentiary hearing when it alleges that the jury was exposed to "factual information specific to an issue in the case introduced from outside the record").

¶ 240 The affidavit indicates that at least some of the jurors who ultimately decided defendant's guilt conducted a type of experiment at the Parkview Condominiums to determine whether they could tell the color of various cars that drove past on Speer Boulevard. Such information, if true, was relevant to the issues at trial because, while the prosecution presented evidence that defendant was driving a white Tahoe, a witness testified that he had seen a green or brown SUV speed down Speer Boulevard after the shooting. Defendant presented evidence that Daniel Harris had travelled with friends in a green SUV on the night of the shooting.

¶ 241 Therefore, any information learned by the jurors as a result of their experiment was extraneous information that was relevant to the issues in the case and a hearing is required. *See Harlan,* 109 P.3d at 624 ("[I]nformation that is not properly received into evidence or included in the court's instructions is extraneous."); *Destination Travel, Inc.,* 799 P.2d at 457 (a hearing is warranted where an affidavit alleges the jury was exposed to extraneous information).

¶ 242 In addition, there is evidence that after dismissal, the alternate juror contacted a deliberating juror and the two travelled to the deliberating juror's home. According to the investigator's affidavit, the two discussed the substance of the deliberations and discussed what the deliberating juror planned to do. Because the alternate had been dismissed, that juror may have acted as an outside influence on the deliberating juror. *See Prosperi*, 201 F.3d at 1340. And inquiry into such an influence is permitted under CRE 606(b)(2). *See People v. Rudnick*, 878 P.2d 16, 21 (Colo.App.1993) ("If the alleged misconduct involves ... coercion ... the trial court should conduct a hearing to determine whether there is a reasonable possibility that the misconduct affected the verdict to the defendant's detriment.").

¶ 243 Furthermore, the affidavit permits the inference that the jurors may have prematurely decided the guilt of defendant. We agree that the cases requiring inquiry into the possibility of premature juror deliberations, discovered postverdict, are extremely rare. *See Williams–Davis*, 90 F.3d at 505 (and cases cited therein). Because, however, this case involves a situation in which the jury may have both been exposed to extraneous information and prematurely decided the issue of defendant's guilt, we conclude that this case is one that does require such inquiry. *Cf. id.* (" '[W]hen there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.' " (quoting *United States v. Resko*, 3 F.3d 684, 690 (3d Cir.1993))).

¶ 244 We are particularly concerned that the same jurors who may have conducted the extraneous experiment may also have been voting on the guilt or innocence of defendant on a daily basis throughout the trial. It is clear that a court may not inquire as to the actual effect of any pre-deliberations under CRE 606(b). And we agree that the mere fact that pre-deliberations occurred is likely insufficient to establish prejudice. *Cf. Williams–Davis*, 90 F.3d at 504 ("[E]ven if

Rule 606(b) does not actually bar receipt of evidence of pre-deliberation discussions, a trial court is virtually automatically justified in declining to pursue such an inquiry.").

¶ 245 However, we are also persuaded that a court should be able to assess the timing, frequency, and substance of these types of discussions when it decides whether a defendant has received a fair trial. *See Farmer*, 717 F.3d at 565; *Jadlowe*, 628 F.3d at 20–21 (it is permissible for a court to inquire whether premature deliberations took place and, if so, the number of jurors involved, the content of the discussion, and the frequency and timing of the discussions).

¶ 246 Because the trial court did not make any findings with respect to its decision to deny defendant's motion for a new trial, remand is required. While defendant has set forth sufficient factual information to trigger concern regarding his right to a fair trial, he has not proven extraneous information was "in fact communicated" to one or more of the jurors. *Destination Travel, Inc.*, 799 P.2d at 456 (citing *Wiser*, 732 P.2d at 1143). And the trial court has not made the necessary findings to determine whether defendant was objectively prejudiced by the jury's actions, if they occurred. *Cf. Butters v. Wann*, 147 Colo. 352, 356, 363 P.2d 494, 496–97 (1961) (To determine whether a new trial is required the trial court must "hear the facts of the alleged misconduct and ... determine as a matter of law the effect reasonably calculated to be produced upon the minds of the jury by such misconduct.").

¶ 247 The court on remand should inquire as to whether misconduct actually occurred, whether information obtained by the jurors participating in the misconduct was disseminated to other jurors, and, if so, whether that information reached the jury before it came to a unanimous verdict. *See Jadlowe*, 628 F.3d at 20–21; *Harlan*, 109 P.3d at 626. If the trial court factually concludes that the jury considered improper information, it must decide whether the "information posed a reasonable possibility of prejudice to" defendant. *Holt*, 266 P.3d at 447.

## VI. Conclusion

¶ 248 We reverse the trial court's ruling denying defendant's motion for a new trial and remand for an evidentiary hearing on the issue of juror misconduct. If misconduct occurred and there is a reasonable possibility that defendant was prejudiced by it, the court shall order a new trial. If not, the judgment of conviction remains affirmed, subject to defendant's right to appeal the order.

JUDGE GRAHAM and JUDGE VOGT * concur.